Dena BRISCOE, et al., Plaintiffs,

v.

John E. POTTER, United States Postmaster General, et al., Defendants.

No. CIV.A. 03–2084(RMC).

United States District Court, District of Columbia.

Nov. 19, 2004.

Paul J. Orfanedes, Washington, DC, Dale Lee Wilcox, Norfolk, VA, for Plaintiffs.

Glenn Stewart Greene, R. Joseph Sher, Department of Justice, Washington, DC, for Defendants.

## MEMORANDUM OPINION

ATTRIDGE.

The entire country remembers the anxiety that ensued following public revelation that a letter containing anthrax had been delivered to Senator Tom Daschle's office on October 15, 2001. What was not immediately appreciated was that the letter to Senator Daschle exposed some postal workers to its deadly contents when it was processed through the United States Postal Service Brentwood Processing and Distribution Center ("Brentwood") in Washington, D.C. Other Brentwood employees now sue several high-ranking officials of the United States Postal Service ("USPS") in their individual capacities [1]—John E. Potter, Postmaster General; Thomas Day, Vice President of Engineering; and Timothy C. Haney, Senior Plant Manger—for allegedly providing false and/or misleading information, and failing to provide accurate information, about the safety of the facility after they allegedly knew it was contaminated with anthrax.

Plaintiffs assert that USPS officials deprived them and other Brentwood workers of their rights to procedural and substantive due process under the Fifth Amendment to the United States Constitution, giving rise to personal liability.[2] Taken together, the first three counts of the complaint allege that Defendants' conduct prevented Plaintiffs from invoking protections and remedies under their collective bar-

---

1. Plaintiffs also sue USPS Unknown Officials Nos. 1–10.

2. Each plaintiff brings this action in his or her individual capacity and also claims to be a representative of the Brentwood employees represented by the union of which the individual plaintiff is a member. Plaintiffs Dena Briscoe and Jeffrey Butler are members of the American Postal Workers Union (APWU); Plaintiffs Terrell Worrell and Vincent D. Gagnon are members of the National Postal Mail Handlers Union (NPMHU); Plaintiff Vernon Porter, now deceased, was a member of the National Association of Letter Carriers (NALC); and Plaintiff Ossie L. Alston is a member of the National Association of Postal Supervisors (NAPS). USPS has collective bargaining agreements covering the affected employees with each of these unions except NAPS. Mr. Alston has not claimed that he was deprived of any right under a collective bargaining agreement.

gaining agreements, the Occupational Safety and Health Act of 1970, 29 U.S.C. § 654 *et seq.*, and USPS emergency procedures. The fourth count alleges that Defendants infringed on Plaintiffs' "substantive due process liberty interest in a safe working environment free from needless danger[.]" Compl. ¶ 127. Defendants move to dismiss the complaint, arguing that the Federal Employees' Compensation Act ("FECA"), 5 U.S.C. § 8101 *et seq.*, is the exclusive remedy available to federal employees injured in the workplace and that each defendant is protected by qualified immunity from suit. Plaintiffs oppose this motion.

## I. BACKGROUND [3]

On Tuesday, October 9, 2001, an unknown person(s) mailed from Trenton, New Jersey, an anthrax-laden letter addressed to United States Senator Tom Daschle at his office in Washington, D.C.[4] That letter arrived in a mail bag at Brentwood on or about Thursday, October 11, 2001. The mail bag was opened and its contents were separated into the Delivery Bar Code Sorter ("DBCS") machine # 17; the Daschle letter was fed manually into DBCS # 17 at approximately 7:10 a.m. The letter was then moved to the Government Mail section for delivery to the Hart Senate Office Building, where Senator Daschle's office is located. Between approximately 8:00 a.m. and 9:40 a.m., DBCS # 17 was opened in the normal course of operations and a large blower using compressed air was used to blow debris and dust from the conveyor belts and optical reading heads of the machine.

The Daschle letter was delivered to the Hart Senate Office Building at approximately noon on Friday, October 12, 2001. It was opened in the Senator's personal office the following Monday, October 15, 2001. The envelope contained a fine white powder, which aroused suspicion. The Capitol Police were called and they performed a field test on the letter, which was ultimately found to contain anthrax spores. Subsequently, the ventilation system in the Hart Senate Office Building was shut down and the building was closed; bundles of letters and packages were quarantined and all mail delivery was suspended; staffers in Senator Daschle's office were tested and given antibiotics; and tours of the Capitol were canceled.

In contrast, the Brentwood facility continued to operate as usual. During a regularly-scheduled "floor" meeting on Monday, October 15, 2001, Larry Littlejohn, a Brentwood maintenance technician, asked his supervisor for a briefing on anthrax and proper safety procedures. The supervisor refused to provide the requested briefing, threatened Mr. Littlejohn with a seven-day suspension, and had him forcibly expelled from the building. Mr. Littlejohn was later suspended for seven days for reasons that are not in the record.

Other events also occurred on Monday, October 15, 2001. In Denver, Colorado, Postmaster General Potter delivered a speech during which he declared that the USPS mail system was safe and USPS Vice President of Engineering Day began coordinating the USPS response to the Daschle letter. In addition, the Daschle letter was sent to the United States Army

---

3. For purposes of a motion to dismiss, the facts are taken from the allegations of the complaint and are presumed to be true. *See* infra Part III. In fairness, it should be noted that Defendants "flatly deny that they knew that the Brentwood facility was contaminated

by anthrax or knew that Brentwood workers were at risk for anthrax." Defs.' Mot. to Dismiss at 5 n. 2 ("Defs.' Mot.").

4. An anthrax-laden letter was also mailed to Senator Patrick Leahy.

Medical Research Institute for Infectious Disease ("Institute") for further testing, where Dr. John Ezzell tested it. Dr. Ezzell characterized the anthrax in the letter as "weaponized" because it was so potent. Compl. ¶ 48.

On Tuesday, October 16, 2001, all Senate employees were tested for anthrax exposure and given antibiotics as a countermeasure. The tests apparently "showed that at least twenty (20) Senate staffers had been exposed to anthrax, including staffers on a floor below Senator Daschle's office and at least one staffer who had not been at work when the letter was opened the previous day." *Id.* ¶ 49. On that same day, Major General John Parker, United States Army Commanding General of the Institute, stated that the anthrax spores in the Daschle letter constituted "a very potent form of anthrax that was clearly produced by someone who knew what he was doing." *Id.* ¶ 50 (internal quotation marks omitted). The Federal Bureau of Investigation ("FBI") reported to the USPS Inspection Service which, in turn, notified Mr. Potter that the letter had contained a "potent" strain of anthrax. *Id.* ¶ 51. Despite these developments, USPS officials allegedly instructed Brentwood supervisors "to provide false safety briefings ... representing to the employees that there was no evidence any anthrax contaminated letter or mail had come through the facility at any time, including the letter that was sent to Senator Daschle's office." *Id.* ¶ 53. Plaintiff Ossie Alston, a supervisor at Brentwood, asserts that he refused to deliver this message and a fellow supervisor gave the briefing.

On Wednesday, October 17, 2001, the United States House of Representatives was shut down after it appeared that thirty-one (31) staff members had tested positive for exposure to anthrax.[5] Anthrax spores were found in a mail room at the Dirksen Senate Office Building, through which the letter to Senator Daschle had passed before being sent on to the Hart Senate Office Building. USPS ordered that the Brentwood facility be tested for anthrax spores on that day, as well, although no one advised employees of any possible danger.

On Thursday, October 18, 2001, all buildings on Capitol Hill were closed and quarantined. USPS officials, including Brentwood Plant Manager Timothy Haney and USPS Senior Vice President Deborah Willhite, met that morning with Senate representatives. According to notes kept by Mr. Haney, he privately advised Ms. Willhite that " 'the mail was leaking and that we were affected.' " *Id.* ¶ 60. During that same morning, USPS was notified that the Centers for Disease Control ("CDC") had confirmed that a letter carrier in New Jersey, where the Daschle letter had been mailed, was suffering from cutaneous anthrax. However, during a morning press conference at the White House, Postmaster General Potter assured the public that the mail was safe.

In the early afternoon, the Postmaster General held a second press conference in an unused section of Brentwood, where he again told the news media and employees in attendance that Brentwood was safe. When Plaintiff Vincent Gagnon attempted to ask a question at the press conference, a Postal Inspector prevented him from doing so. Mr. Gagnon—who had clocked out to attend the press conference—then returned to work, where his supervisor informed him that "she had been directed [by Plant Manager Haney] to initiate proceedings to fire him for going to the press conference and trying to ask questions." *Id.* ¶ 67.

---

**5.** Plaintiffs report that the number was later reduced to twenty-eight staffers.

Plant Manager Haney held a series of "floor" meetings with Brentwood employees on Thursday, October 18, 2001, to inform them that there was no anthrax in the building. He also mentioned that the CDC would be conducting tests in protective gear (*i.e.*, "moonsuits"). At one meeting, plaintiff Terrell Worrell asked about the possible dangers of dust in the air. Mr. Haney allegedly responded, "What do you want us to do? Put bars on the windows, shut off the fans and close the doors? If we do those things, we are giving in to terrorism." *Id.* ¶ 74. Mr. Haney apparently told employees that they would lose their jobs if they did not report for work, noting that "it would cost the USPS $500,000 a day if the Brentwood facility were shut down." *Id.* At another "floor" meeting, Mr. Haney allegedly refused to answer questions about why the machines and the building were being tested but employees were not.

Also on Thursday, October 18, 2002, USPS contacted the Fairfax County (Virginia) HAZMAT Team to have an on-site field test for anthrax spores conducted at Brentwood. Two HAZMAT Team members and inspectors from a private consulting firm came to Brentwood in moonsuits that afternoon, to begin testing for contamination while postal employees continued their normal duties. At least by sometime that evening, the test results apparently showed that some of the Brentwood equipment " '[a]gain . . . tested hot.' "[6] *Id.* ¶ 71. Testing continued until 2:30 a.m. on October 19, 2001.

Notes from Plant Manager Haney indicate that, by 11 a.m. on Friday, October 19, 2001, USPS officials had determined that the DSBC # 17 had been used to sort the mail that included the letter to Senator Daschle. The CDC arrived at Brentwood that afternoon and began its analysis. In the meantime, USPS officials asked the District of Columbia Department of Health to place all Brentwood employees on antibiotics for exposure to anthrax. On that same day, Mr. Potter told a television interviewer that early reports of testing showed no anthrax contamination at Brentwood; this same information was posted on all employee bulletin boards at the Brentwood facility. Similarly, Mr. Haney held another series of "floor" meetings to assure employees that Brentwood was safe and that he was doing everything in his power to protect them.

Despite Messrs. Potter's and Haney's representations, rumors began to circulate throughout Brentwood on Friday afternoon that DBCS # 17 was contaminated with anthrax spores. Several technicians assigned to work on DBCS # 17 asked plaintiff Ossie Alston if this were true. Mr. Alston told the employees to stay away from DBCS # 17 until he could determine the facts. Two supervisors then informed Mr. Alston that they had not been told that DBCS # 17 or any other machine was contaminated. At approximately 4:15 p.m., however, a third supervisor told Mr. Alston that DBCS # 17 was not to be used because it was contaminated. This third supervisor allegedly advised Mr. Alston that gloves and masks were available for employee use, but that he should not pass them out to employees unless they specifically asked for them. At some point on Friday, October 19, 2001, DBCS # 17 was taken off-line.

At approximately 11:30 p.m. on Friday, October 19, 2001, a Brentwood manager "insisted that [DCBS # 17] was not contaminated and ordered [technicians] to clean DCBS # 17 by 'blowing it out' with

---

6. USPS informed the Court at oral argument that the Fairfax HAZMAT field tests showed no anthrax contamination. While this fact is missing from the complaint, it was not contested by the plaintiffs. In any event, it does not affect the legal analysis.

compressed air and to get it on-line immediately." *Id.* ¶ 89. Brentwood employees reportedly heard managers state that they needed DBCS # 17 on-line because another DBCS machine had broken down. As a result, DBCS # 17 was re-activated.

Also on Friday, October 19, 2001, Brentwood employee Leroy Richmond entered the emergency room at Fairfax Inova Hospital with symptoms of inhalation anthrax. Doctors determined from blood tests that Mr. Richmond was suffering from inhalation anthrax. Mr. Richmond's wife called Plant Manager Haney and left a voicemail message describing her husband's condition and telling Mr. Haney to shut down Brentwood.

During an early-morning meeting with the Mayor's Office of Emergency Response on Saturday, October 20, 2001, it is alleged that USPS officials—including Mr. Haney—discussed Mr. Richmond's illness, and " 'confirmation that the facility tested positive; and that more testing was on the way.' " *Id.* ¶ 93. Nonetheless, Mr. Haney conducted "floor" meetings at Brentwood throughout the day on Saturday and allegedly told employees, " 'We have made it this far and we do not have any positive test results for anthrax.' " *Id.* ¶ 94. He promised that all news would be shared with employees and urged them to concentrate on processing the mail and meeting processing goals. Tests in the Ford Office Building on Saturday turned up anthrax where mail was processed for the U.S. House of Representatives and where it was delivered from Brentwood.

At 4:39 a.m. on Sunday, October 21, 2001, Brentwood employee Thomas Morris, Jr., called 911 complaining of anthrax-like symptoms. Mr. Morris died of inhalation anthrax several hours later.

At approximately 11:00 a.m. on Sunday, a CDC representative told Plant Manager Haney that Brentwood needed to be closed. Mr. Haney then ordered all employees to gather at noon in the cafeteria, where he told them that a postal worker was in the hospital with a confirmed case of anthrax exposure and that Brentwood was being closed as a " 'precautionary measure.' " *Id.* ¶ 99. The employees in attendance were directed to go to Judiciary Square, a District of Columbia Government facility, for medical evaluation and treatment.

Not all Brentwood employees were allowed to attend the meeting in the cafeteria; a group of eight to ten workers was directed to report to a manager's office. They were told that they were needed to "round up all of the mail at Brentwood and move it to the loading dock/platform so that it could be loaded onto trucks" and removed from the building. *Id.* ¶ 31. The manager said that she thought Brentwood would be closed as a "precautionary measure." Plaintiff Jeffrey Butler was among this small group of employees. He worked until 5:00 p.m. and then, upon driving out of the parking lot, received a flyer that was being distributed to incoming workers. Only upon receiving the flyer did Mr. Butler learn that Brentwood was closed and the postal workers were being directed to Judiciary Square for medical evaluation and treatment. Plaintiff Vincent Gagnon continued to work inside Brentwood until approximately 7:00 p.m. to turn off fans and air and dust-handling equipment. Brentwood was finally closed at approximately 7:00 p.m. on Sunday, October 21, 2001, although truckers continued to handle the mail that had been in Brentwood and was being moved for processing to other facilities.

On Monday, October 22, 2001, Brentwood employee Joseph Curseen went to the hospital with flu-like symptoms. Mr. Curseen died that evening of inhalation anthrax. Two other Brentwood employees were hospitalized and nine became ill with

anthrax-like symptoms. On that day, one of the mid-level managers allegedly told a supervisor that the mid-level managers had been instructed by senior management to lie to the floor supervisors and employees about Brentwood being contaminated with anthrax.

When the complaint was filed in October of 2003, Brentwood was still closed due to anthrax contamination. It has now re-opened.

## II. USPS POLICIES AND AGREE-MENTS ON SAFETY AND HEALTH

Each of the plaintiffs except Mr. Alston is represented by a union that has negotiated a collective bargaining agreement with USPS setting terms and conditions of employment. The then-effective agreements with APWU, NPMHU, and NALC contained provisions that stated, "It is the responsibility of management to provide safe working conditions in all present and future installations and to develop a safe working force." In addition, each agreement contained a clause that stated:

The Employer [USPS] and the Union insist on the observance of safe rules and safe procedures by employees and insist on correction of unsafe conditions.... [T]he work place must be maintained in a safe and sanitary condition, including adequate occupational health and environmental conditions. If an employee believes he/she is being required to work under unsafe conditions, such employees may: (a) notify such employee's supervisor who will immediately investigate the condition and take corrective action if necessary; (b) notify such employee's steward, if available, who may discuss the alleged unsafe condition with such employee's supervisor; (c) file a grievance at Step 2 of the grievance procedure within fourteen (14) days of notifying such employee's supervisor if no corrective action is taken during the employee's tour; (d) and/or make a written report to the Union representative from the local Safety and Health Committee who may discuss the report with such employee's supervisor.

*Id.* ¶¶ 20, 23, 26. There was, and is, no collective bargaining agreement between USPS and NAPS, a union of supervisors.

USPS issued Management Instruction EL–860–1999–3 in October 1999. Titled, "Emergency Response to Mail Allegedly Containing Anthrax," the Instruction outlined the hazards of exposure to anthrax. It directed that " '[i]t is management's responsibility to minimize potential exposures through quick isolation and evacuation until emergency response and law enforcement can arrive and take control of the incident.' " *Id.* ¶ 32. When anthrax exposure is suspected, USPS officials are directed by the Instruction to do the following:

1. Alert employees to stay in evacuation areas and not leave postal property so that they can receive necessary information and medical follow-up if appropriate.

2. Invoke the emergency action plan, including the following:

a. Effecting mechanical shutdowns (including air handling equipment), isolation and evacuation.

b. Notifying the Inspection Service.

c. Notify [sic] Postal Service Aviation Mail Security Office.

d. Notify [sic] postal and local community emergency responders, which may include the health department, fire department, or local law enforcement.

*Id.* ¶ 34. The complaint alleges that this Instruction was ignored.

At all relevant times, employees at Brentwood were entitled to the full protections and remedies of the federal Occupa-

tional Safety and Health Act of 1970,[7] 29 U.S.C. § 654, *et seq.*, the right to decline to perform work for health and safety-related reasons, the right to request health and safety inspections, and the right to file complaints about unhealthy and unsafe work conditions. *Id.* ¶ 29.

## III. LEGAL STANDARDS

For the court to grant a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, it must "appear[ ] beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C.Cir.1994). The primary issue in resolving a motion to dismiss is not whether the plaintiff will ultimately prevail, but whether he or she is entitled to offer evidence to support his or her claims. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds, Davis v. Scherer* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). At this early stage of the proceedings, the court must accept as true all of the plaintiff's well-pled factual allegations and draw all reasonable inferences in favor of the plaintiff. *See Alexis v. District of Columbia,* 44 F.Supp.2d 331, 336–37 (D.D.C.1999). Although the court must construe the complaint in the light most favorable to the plaintiff, it "need not accept inferences drawn by the plaintiff if such inferences are not supported by the facts set out in the complaint." *Kowal,* 16 F.3d at 1276. In addition, the court does not need to accept the plaintiff's legal conclusions as true. *See Alexis,* 44 F.Supp.2d at 337.

## IV. ANALYSIS

Plaintiffs contend that USPS officials suspected that Brentwood was contaminated with anthrax on Wednesday, October 17, 2001, and knew absolutely by Thursday or Friday, October 18 or 19, that those suspicions were accurate. Nonetheless, USPS officials are alleged to have consistently assured Brentwood employees that the facility was safe and encouraged them to continue processing the mail until just before noon on Sunday, October 21—and even then some postal workers remained in the plant until Sunday evening removing mail. Defendants are accused of violating Plaintiffs' Fifth Amendment rights to due process by providing false and/or misleading information and/or failing to provide accurate information about the safety of the facility. This misinformation allegedly deprived Plaintiffs of remedies allowed under their collective bargaining agreements, deprived Plaintiffs of the protections and remedies of the OSH Act, and deprived Plaintiffs of the benefit of USPS emergency response procedures. Count V of the Complaint alleges that the misleading and/or false information also deprived Plaintiffs of their "substantive due process liberty interest in a safe work environment free from needless danger." Compl. ¶ 127. Plaintiffs seek to take advantage of Supreme Court precedent that has recognized suits for money damages against individual federal officials for violations of citizen constitutional rights. *See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 390, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (Fourth Amendment violation "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional con-

---

**7.** The Occupational Safety and Health Act is enforced by the Occupational Safety and Health Administration within the U.S. Department of Labor. To avoid confusion, the former is referred to as the OSH Act and the latter as OSHA.

duct."). Defendants argue that *Bivens* does not apply to this situation and that Plaintiffs have failed to allege a cognizable substantive due-process violation. In the alternative, Defendants contend that each of them is protected by qualified immunity from Plaintiffs' procedural and substantive due-process claims.

### A. Plaintiffs' Procedural Due Process Claims

Plaintiffs assert that Defendants knew or should have known that Brentwood was contaminated with anthrax "but knowingly provided them with false and/or misleading information about the safety of the facility and/or failed to provide them with accurate information about the contamination . . . [as a result of which] Plaintiffs suffered unnecessarily prolonged exposure to deadly anthrax spores." Pls.' Motion to Strike ¶ 1; Compl. ¶¶ 43–44. Plaintiffs also allege that USPS officials "threatened, coerced and intimidated the Brentwood workers into not making inquiries about the Daschle letter, the safety of the facility, or their own safety" in violation of their due-process rights. Pls.' Opp. to Defs.' Motion to Dismiss ("Pls.' Opp.") at 8; Compl. ¶ 44.

A private damages remedy for constitutional violations by federal officials was first recognized in *Bivens,* a case in which the Supreme Court authorized money damages for the victim of an unreasonable search and seizure in violation of Fourth Amendment rights. *See* 403 U.S. at 390, 91 S.Ct. 1999. The Court based its new remedy on the courts' inherent powers to remedy constitutional violations, at least in the absence of apparent alternative remedies and with "no special factors counseling hesitation in the absence of affirmative action by Congress." *Id.* at 396, 91 S.Ct. 1999. Subsequent decisions in *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), and *Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980), allowed *Bivens* actions because "the Court found that there were no 'special factors counseling hesitation in the absence of affirmative action by Congress,' no explicit statutory prohibition against the relief sought," and "no exclusive statutory alternative remedy." *Schweiker v. Chilicky,* 487 U.S. 412, 421, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988).

In the three decades since *Carlson,* the Supreme Court has "consistently refused to extend *Bivens* liability to any new context or new category of defendants." *Correctional Servs. Corp. v. Malesko,* 534 U.S. 61, 68, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001). The Court's "more recent decisions have responded cautiously to suggestions that *Bivens* remedies be extended into new contexts." *Chilicky,* 487 U.S. at 422, 108 S.Ct. 2460. As the law has developed, the Court has relied on the two factors identified in *Bivens* to prevent its extension: the very existence of "apparent alternative remedies" is itself a "special factor [ ] counseling hesitation." *See id.* at 423, 91 S.Ct. 1999 ("When the design of a government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional *Bivens* remedies.").

Perhaps most notably, the courts have been hesitant to extend *Bivens* into the employer-employee relationship between the federal government and its employees. *See Bush v. Lucas,* 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983). *Bush* made this point emphatically. The Court concluded that the federal employment relationship is "governed by comprehensive procedural and substantive provisions giving meaningful remedies against the United States," *id.* at 368, 103 S.Ct. 2404, and therefore declined to recognize a cause of action against a supervisor who had disci-

plined an employee in violation of his First Amendment rights. *Id.* at 390, 103 S.Ct. 2404; *see also Spagnola v. Mathis,* 859 F.2d 223, 230 (D.C.Cir.1988) *(per curiam)* *(en banc)* (finding the Civil Service Reform Act to be a "special factor" precluding judicial creation of a *Bivens* remedy to challenge a federal personnel action). "Although the plaintiff [in *Bush*] had no opportunity to fully remedy the constitutional violation, [the Supreme Court] held that the administrative review mechanisms crafted by Congress provided meaningful redress and thereby foreclosed the need to fashion a new, judicially crafted cause of action." *Malesko,* 534 U.S. at 68, 122 S.Ct. 515. Thus, "[s]o long as the plaintiff has an avenue for *some redress,* bedrock principles of separations of powers foreclose [ ] judicial imposition of a new substantive liability." *Id.* at 69, 122 S.Ct. 515 (emphasis added).

There is no doubt that the plaintiffs in this matter have access to a full range of administrative and contractual fora to remedy the harm that exposure to anthrax might have created. First, of course, is the Federal Employees Compensation Act ("FECA"), 5 U.S.C. § 8101 *et seq.,* which is the federal sector version of workers' compensation. Like State workers' compensation programs, FECA provides the exclusive remedy for claims against the employer—the United States—for workplace injuries and illnesses. *See United States v. Lorenzetti,* 467 U.S. 167, 169, 104 S.Ct. 2284, 81 L.Ed.2d 134 (1984) ("[T]he United States' liability for work-related injuries under FECA is exclusive . . . ."); *Turner v. Tenn. Valley Auth.,* 859 F.2d 412, 413 (6th Cir.1988) (noting that the Supreme Court "has consistently held that FECA is the exclusive remedy employed by federal agencies and instrumentalities."); *DiPippa v. United States,* 687 F.2d 14, 17 (3d Cir.1982) ("Where FECA applies, its remedy is exclusive and bars all other claims for compensation against the

Government."). Indeed, FECA itself is explicit that it offers the exclusive remedy for work-related injuries in claims against the United States or its instrumentalities. *See* 5 U.S.C. § 8116(c) (FECA "is exclusive and instead of all other liability of the United States . . . to the employee . . . because of the injury . . . in a civil action . . . .").

Second, Plaintiffs had, in October 2001, and still do have, access to OSHA and its enforcement of workplace health and safety through inspections and citations for dangerous conditions. The OSH Act allows an inspector to close a facility if significant danger exists; orders and citations issued by OSHA are subject to challenge and litigation with full review in the courts of appeals and the Supreme Court as needed. *See* 29 U.S.C. § 660. Third, all but one of the named plaintiffs have rights under the various collective bargaining agreements to which the postal worker unions are signatory; every one of these contracts provides for grievances over safety issues that can lead to independent and binding arbitration. *See Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). Because of these inter-related and complex schemes, most particularly FECA, Defendants seek dismissal, arguing that these alternative avenues counsel against recognizing a *Bivens* remedy here.

Plaintiffs contend that Defendants have missed the point entirely. They do not dispute the existence of FECA, OSHA, or their collective bargaining agreements' grievance/arbitration processes. Instead, they claim that "they are entitled to maintain a *Bivens* cause of action for money

damages because Defendants wholly prevented them from pursuing the very remedies that do exist and that they were entitled to pursue." Pls.' Surreply at 4 (citing *Grichenko v. USPS,* 524 F.Supp. 672, 676–78 (E.D.N.Y.1981), *aff'd without opinion,* 751 F.2d 368 (2d Cir.1984)). Plaintiffs argue that their procedural due-process claim is separate from any claim for substantive injury that they might file under FECA, the OSH Act, or the collective bargaining agreements. *Grichenko* appears to support this argument.

In *Grichenko,* a postal worker with an eye injury alleged that his supervisors "intentionally acted to deprive him of the opportunity to present a disability claim to the Department of Labor." *Id.* at 677. The District Court for the Eastern District of New York found deliberate failures on the part of Mr. Grichenko's supervisors to submit his FECA disability claim. Such failures created a *Bivens* remedy because Mr. Grichenko was time-barred from obtaining FECA benefits and because FECA would not provide a "substitute remedy for the constitutional violation asserted here." *Id.* Finding that these facts "warrant[ed] the availability of a strong deterrent," the court denied a USPS motion to dismiss. *Id.* The Second Circuit affirmed without opinion. *See Grichenko v. USPS,* 751 F.2d 368 (2d Cir. 1984); *see also Bishop v. Tice,* 622 F.2d 349, 357 (8th Cir.1980) (discharged federal employee might have procedural due process claim, despite administrative appeal procedures, "if, as he alleged, defendants blocked his resort to [appeal procedures] by failing to cooperate with his inquiries and by continuing their threat to lodge criminal charges . . . .").

Nonetheless, *Grichenko* is not the strong support Plaintiffs wish it were. The law has passed it by. After *Bishop* and *Grichenko,* the Supreme Court decided *Schweiker v. Chilicky,* 487 U.S. 412, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988), which significantly limits the availability of a *Bivens* suit when an alternative administrative process exists. *Chilicky* specifically held that the remedy available under the administrative scheme need not be as broad as a lawsuit under *Bivens* to bar the latter. *Id.* at 423, 91 S.Ct. 1999. The D.C. Circuit applied *Chilicky* in *Spagnola v. Mathis,* 859 F.2d 223 (D.C.Cir.1988) (*per curiam*) (*en banc*), emphasizing that "the *Chilicky* Court made clear that it is the comprehensiveness of the statutory scheme involved, not the 'adequacy' of specific remedies extended thereunder, that counsels judicial abstention." 859 F.2d at 227. Upon its re-consideration of the same issues, the Eighth Circuit abandoned its original analysis in *Bishop v. Tice* and adopted the reasoning of *Spagnola. See McIntosh v. Turner,* 861 F.2d 524 (8th Cir.1988) (holding that there is no need for a *Bivens* remedy in the area of federal employment covered by the Civil Service Reform Act).

Plaintiffs argue that the Eighth Circuit did not abandon the rule "that a *Bivens* cause of action may be brought if government officials prevent a plaintiff from availing himself of the remedies that do exist and which he is entitled to pursue." Pls.' Surreply at 2–3. While this argument may be literally correct, it fails to appreciate the applicability of the *Chilicky* analysis here.

The *Chilicky* plaintiffs sought damages because their Social Security disability benefits had been denied without giving them access to full administrative and judicial review, as required by the Social Security Act. *See Chilicky,* 487 U.S. at 417–20, 108 S.Ct. 2460. The plaintiffs here attempt to distinguish *Chilicky, McIntosh* and *Spagnola* because they "are not arguing that they are entitled to maintain a *Bivens* cause of action for money damages

because the remedies they were entitled to pursue are inadequate (as in *McIntosh* and *Spagnola*) or are non-existent (as in *Schweiker [v. Chilicky]*)." Pls.' Surreply at 3. Instead, Plaintiffs contend that "Defendants wholly prevented them from pursuing the very remedies that do exist and that they were entitled to pursue .... Defendants prevented Plaintiffs from seeking or availing themselves of the remedies they were entitled to pursue in a timely manner." *Id.* at 4.

Despite Plaintiffs' attempt to distinguish *Chilicky*, *McIntosh*, and *Spagnola* from this case, Plaintiffs' allegations raise the same kind of claim in a different fact pattern. As the Supreme Court noted in *Chilicky*, Plaintiffs' claim is one for "consequential damages for hardships resulting from an allegedly unconstitutional denial of a statutory right." *Chilicky*, 487 U.S. at 428, 108 S.Ct. 2460. Notably, the defendants in *Chilicky* had affirmatively misled the plaintiff as to their handling of his FECA claim. *Id.* at 418, 108 S.Ct. 2460. The instant claim is essentially the same: it seeks damages arising from USPS officials preventing Plaintiffs from timely filing grievances or calling OSHA to terminate their alleged exposure to anthrax. Like the Social Security claimants in *Chilicky*, Plaintiffs had a certain avenue to relief (whether a grievance through the congressionally-sanctioned bargaining process or OSHA), which Defendants allegedly blocked through affirmative misinformation. Just as in *Chilicky*, this Court cannot "separate the harm resulting from the alleged constitutional violation from the harm resulting from the denial of a statutory right." *Id.* at 428, 108 S.Ct. 2460.[8]

Caution in extending *Bivens* remedies to the federal workforce is particularly necessary. The Supreme Court's admonition from *Bush v. Lucas* remains pertinent in this case:

> Congress is in a far better position than a court to evaluate the impact of a new species of litigation between federal employees on the efficiency of the civil service. Not only has Congress developed considerable familiarity with balancing governmental efficiency and the rights of employees, but it may also inform itself through factfinding procedures such as hearings that are not available to the courts.

487 U.S. at 389, 108 S.Ct. 2428. "'[S]pecial factors' preclude the creation of a *Bivens* remedy for civil service employees and applicants who advance constitutional challenges to federal personnel actions." *Spagnola*, 859 F.2d at 230. The Court does not condone the alleged campaign of misinformation from USPS to the postal employees at Brentwood, but finds that

---

8. It should be noted that even if this Court were to accept Plaintiffs' legal argument that a *Bivens* remedy is appropriate where "government officials prevent a plaintiff from availing himself of the remedies that do exist and which he is entitled to pursue," Pls.' Surreply at 2–3, the imposition of such a remedy would not be appropriate based on the facts that Plaintiffs have alleged. Unlike the plaintiffs in *Grichenko* and *Bishop*, Plaintiffs here have failed sufficiently to allege that their access to all of the remedies that they were entitled to pursue were blocked by Defendants. Nothing in the complaint suggests that Plaintiffs were precluded from filing a grievance under their collective bargaining agreements, or a charge with OSHA, or utilizing any other post-exposure remedies that were available to them. *See Stuto v. Fleishman*, 164 F.3d 820, 826 (2d Cir.1999)(noting that "*Grichenko* involved conduct that *foreclosed* the administrative remedies of FECA, and therefore FECA's protections were unavailable")(emphasis added); *Richmond v. Potter, et al.*, No. 03 Civ. 018, slip op. at 27 (D.D.C. Sept. 30, 2004) (distinguishing plaintiff postal worker's claims from the claims in *Grichenko* because "FECA is still very much available to Plaintiff as a remedy.")

the existence of numerous avenues of relief for the underlying harm—possible exposure to anthrax—counsels against creating an individual *Bivens* remedy from USPS managers. Plaintiffs' procedural due-process claim is barred by *Chilicky* and *Spagnola*.[9]

The complaint allegations based on denial of procedural due process will be dismissed.[10]

### B. Plaintiffs' Substantive Due Process Claim

Plaintiffs also assert that Defendants violated their substantive rights to due process "arising under the Government/State Endangerment Theory of recovery." Pls.' Surreply at 5. Plaintiffs characterize this theory as one that makes a government official "liable for third-party injury where the government official affirmatively acts to create or enhance the danger that ultimately results in the individual's harm." *Id.; see Butera v. District of Columbia.*, 235 F.3d 637, 651 (D.C.Cir.2001). In further explanation, Plaintiffs assert:

> once Defendants *affirmatively acted* to provide Plaintiffs with information regarding the safety of the Brentwood facility and whether the facility was contaminated with anthrax, they had a constitutional duty, under the well-established State/Government Endanger-

ment Theory, not to enhance or make Plaintiffs more vulnerable to the danger of anthrax contamination (a) by lying to them and misleading them with information Defendants knew to be false, and (b) by preventing Plaintiffs from learning of their exposure to anthrax and preventing them from getting medical treatment.

Pls.' Surreply at 6–7. Defendants respond that Plaintiffs' argument must fail because a government employer's failure to warn employees about known risks of harm does not deprive such employees of liberty without due process of law. In the alternative, Defendants contend that all of the defendants have qualified immunity from this claim.

The Supreme Court has defined and interpreted substantive due process as the right of individuals to be protected from arbitrary government action. *See County of Sacramento v. Lewis*, 523 U.S. 833, 845, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). However, "[a]s a general matter, a State's failure to protect an individual from private violence, even in the face of a known danger, 'does not constitute a violation of the Due Process Clause.'" *Butera*, 235 F.3d at 647 (quoting *DeShaney v. Winnebago County Dep't of Soc. Services*, 489 U.S. 189, 197, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)). The Supreme Court has inti-

---

**9.** In the alternative, the Court finds that a *constitutional* right to be free from interference with procedural remedies, such as correct information to trigger a grievance filing or a call to OSHA, was not clearly established in the fall of 2001 so that the defendants would be entitled to qualified immunity were this cause of action to be recognized now. *See Butera v. District of Columbia*, 235 F.3d 637, 652–54 (D.C.Cir.2001).

**10.** Whether plaintiffs can receive FECA benefits or contractual damages for the harms they allege in this lawsuit is unclear but not dispositive. "[I]t is the comprehensiveness of the statutory scheme involved, not the 'ade-

quacy' of specific remedies extended thereunder, that counsels judicial abstention." *Spagnola*, 859 F.2d at 227. The case law is split on the question of whether FECA provides coverage for injuries caused by mental or emotional distress. *See Gergick v. Austin*, 764 F.Supp. 580 (W.D.Mo.1991) (emotional distress claim not covered by FECA); *Sullivan v. U.S.*, 428 F.Supp. 79 (D.C.Wis.1977) (same); *but see Bennett v. Barnett*, 210 F.3d 272 (5th Cir.2000), *cert. denied*, 531 U.S. 875, 121 S.Ct. 181, 148 L.Ed.2d 125 (2000) (postal employee's emotional distress claims against postal officials were preempted by FECA; denial of claims by Secretary of Labor for lack of proof indicated that FECA coverage existed).

mated and several lower courts have held that an exception to this general rule exists " 'where the state creates a dangerous situation or renders citizens more vulnerable to danger.' " *Id.* at 649 (quoting *Reed v. Gardner,* 986 F.2d 1122, 1125 (7th Cir. 1993)); *see DeShaney,* 489 U.S. at 201, 109 S.Ct. 998. The D.C. Circuit adopted this theory of "State Endangerment" in *Butera*—the decision upon which Plaintiffs premise their substantive due-process claim.

*Butera* involved the death of a citizen of the District of Columbia during an undercover drug "buy." Having advised the police that some murder suspects were selling drugs at a certain house, Mr. Butera approached the house from the backyard to buy drugs. He never made it into the house because he was accosted and stomped to death by three men in the backyard. According to the police plan, Mr. Butera was to have exited the front door of the house within fifteen minutes. Although the police observing the front of the house were anxious when he failed to appear, no one searched the backyard. His body was discovered forty minutes later.

After reviewing these facts, the D.C. Circuit Court of Appeals concluded that "an individual can assert a substantive due process right to protection by the District of Columbia from third-party violence when District of Columbia officials affirmatively act to increase or create the danger that ultimately results in the individual's harm." *Butera,* 235 F.3d at 651.[11] However, in adopting this new theory of government liability, the Court emphasized that the government conduct at issue must be "so egregious, so outrageous, that it may fairly be said to shock the contempo-

rary conscience." *Id.* "This stringent requirement exists to differentiate substantive due process, which is intended only to protect against arbitrary government action, from local tort law." *Id.*

■ Thus, in light of *Butera,* whether Defendants can be held liable under the theory of State Endangerment requires a two-part analysis, which raises the following questions: (1) has there been an affirmative act by Defendants to create or increase the danger that resulted in harm to Plaintiffs and, if so, (2) does that act shock the conscience? *See id.; Fraternal Order of Police/Dept. of Corr. Labor Comm., et al. v. Williams, et al.,* 263 F.Supp.2d 45, 47 (D.D.C.2003), *aff'd* 375 F.3d 1141 (D.C.Cir.2004). Based on the allegations in Plaintiffs' complaint, the Court answers each of these questions in the affirmative. However, because Defendants contend that they are entitled to qualified immunity, the Court must also determine whether the contours of the specific constitutional violation that Plaintiffs allege were "clearly established" at the time of Defendants' conduct. Since this question must be answered in the negative, Plaintiffs' substantive due-process claim will be dismissed.

*1. Plaintiffs Have Sufficiently Alleged That Defendants Affirmatively Acted to Increase the Danger of Plaintiffs' Exposure to Anthrax Contamination.*

■ In *Butera,* the D.C. Circuit Court of Appeals emphasized that in order for the court to impose liability under the State Endangerment theory, there must have been *affirmative* conduct by the State to endanger the plaintiff:

---

11. Because the theory of State Endangerment had not previously been recognized in this circuit, the court ultimately dismissed the complaint against the officers, who could not

have known that their actions might make them liable for a violation of Mr. Butera's constitutional rights to substantive due process. *Butera,* 235 F.3d at 654.

Regardless of the conduct at issue ..., a key requirement for constitutional liability is affirmative conduct by the State to increase or create the danger that results in harm to the individual. No constitutional liability exists where the State actors "had no hand in creating a danger but [simply] stood by and did nothing when suspicious circumstances dictated a more active role for them." *Id.* at 650 (citation omitted) (brackets in original); *see also DeShaney,* 489 U.S. at 201, 109 S.Ct. 998 (refusing to impose constitutional liability where the State was aware of certain dangers but "played no part in their creation, nor did it do anything to render [the plaintiff] any more vulnerable to them."). Thus, in situations where State officials encounter a dangerous situation and simply fail to act, liability under the State Endangerment theory should be rejected. *See Butera,* 235 F.3d at 650 ("Absent such affirmative conduct by the state ... courts have rejected liability under a State endangerment concept."); *Reed,* 986 F.2d at 1125 (7th Cir.1993) ("Inaction by the state in the face of a known danger is not enough to trigger the obligation [to protect private citizens from each other]."). Conversely, where state officials create a dangerous situation or render individuals more vulnerable to a dangerous situation, constitutional liability may be imposed. *See Butera,* 235 F.3d at 649; *Reed,* 986 F.2d at 1125.

Defendants argue that Plaintiffs have failed to allege that Defendants acted *affirmatively* to create or enhance a dangerous situation. They contend that Plaintiffs' substantive due-process claim is based on Defendants' *inaction,* and thus hinges solely on "whether the due process clause requires public employers to advise their employees about known risks in the workplace." Defs.' Reply at 5. Defendants rely on the Supreme Court's decision in *Collins v. City of Harker Heights,* 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261

(1992), for the proposition that the failure of government employers to warn its employees about known dangers and to provide its employees with a safe working environment does not rise to the level of a constitutional violation. *See Collins,* 503 U.S. at 126, 112 S.Ct. 1061.

■ Defendants are correct that in light of *Collins,* their mere failure to warn Plaintiffs about a danger of anthrax contamination does not expose them to constitutional liability. *See id.; see also Washington v. District of Columbia,* 802 F.2d 1478, 1482 (D.C.Cir.1986) ("Whatever appellant's rights may be under state law, he has no constitutional right to a safe working environment."). However, Plaintiffs' allegations are not premised upon the notion that Defendants violated their substantive due-process rights solely by failing to warn them of a known risk or to provide them with a safe working environment. Instead, Plaintiffs allege that Defendants made affirmative misrepresentations about the safety of the facility. While it is clear that Plaintiffs do not allege that Defendants *created* the danger at Brentwood, Plaintiffs contend that by providing false safety briefings and representing to employees that there was no evidence of anthrax contamination at the facility (despite alleged actual knowledge to the contrary), Defendants increased the risk that Plaintiffs would be exposed to deadly anthrax spores and made Plaintiffs more vulnerable to such danger.

*Butera* does not support the imposition of constitutional liability under the State Endangerment theory where the defendants merely failed to take any action or "stood by and did nothing" in the face of a known danger. *See Butera,* 235 F.3d at 650. However, taking the allegations in Plaintiffs' complaint as true, Defendants did not simply "stand by and do nothing" once it became known that the Brentwood

facility was contaminated with anthrax. Defendants are alleged to have engaged in a series of actions which intentionally misled Plaintiffs into believing the facility was safe and prevented them from acting to preserve their own safety. Giving Plaintiffs the benefit of crediting the complaint allegations and all reasonable inferences therefrom, they have sufficiently alleged that Defendants took the requisite affirmative actions to trigger liability under the State Endangerment Theory to withstand dismissal on the pleadings.

### 2. Plaintiffs Have Sufficiently Alleged That Defendants' Conduct Shocks the Conscience.

To assert a substantive due-process violation under the State Endangerment theory, Plaintiffs must also demonstrate that Defendants' alleged conduct "was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Butera*, 235 F.3d at 651 (quotations omitted). While it is generally intentional conduct that satisfies this stringent requirement, the Supreme Court has instructed that, in certain situations, "deliberate indifference can rise to a constitutionally shocking level." *County of Sacramento v. Lewis*, 523 U.S. 833, 852, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). However, the D.C. Circuit has concluded that "the lower threshold for meeting the shock the conscience test by showing deliberate indifference as opposed to intentional conduct applies only in 'circumstances where the State has a heightened obligation toward the individual.'" *Fraternal Order of Police*, 375 F.3d at 1146 (quoting *Butera*, 235 F.3d at 651).

*Butera* noted that the State has a "heightened obligation" toward an individual when it takes a person into its custody, thereby creating a situation that "'so restrains [an individual's] liberty that it renders him unable to care for himself.'" *Butera*, 235 F.3d at 651 (quoting *Lewis*,

523 U.S. at 851, 118 S.Ct. 1708). However, the court did not limit situations in which "deliberate indifference" can shock the conscience solely to the context of State custody. In holding that Butera could prove that the defendant police officers' treatment of him in connection with an attempted undercover drug buy "shocked the conscience," the court noted:

> As in the context of State custody, the State *also* owes a duty of protection when its agents increase the danger to an individual. Like prison officials who are charged with overseeing an inmate's welfare, State officials who create or enhance danger to citizens may also be in a position where "actual deliberation is practical" (citations omitted). In the instant case, the officers had the opportunity to plan the undercover operation with care.

*Butera*, 235 F.3d at 652 (emphasis added); *but see Richmond v. Potter, et al.*, No. 03 Civ. 018, slip op. at 16 (D.D.C. Sept. 30, 2004) (noting that courts have been "extremely hesitant" to expand the "special circumstances" in which a state official's deliberate indifference can shock the conscience "outside of the context of *actual custody*")(emphasis in original).

Similarly, in *Estate of Anthony Phillips v. District of Columbia*, 257 F.Supp.2d 69 (D.D.C.2003), this court applied the State Endangerment theory articulated in *Butera*, and ultimately held that the plaintiffs had sufficiently alleged that the defendants' conduct demonstrated "deliberate indifference" that rose to a "constitutionally shocking level." *Id.* at 77. The *Phillips* plaintiffs were injured firefighters and the estates of two deceased firefighters who alleged that the District of Columbia and several fire department employees had violated their substantive due-process rights by failing to train, equip and staff the department appropriately and by failing to

follow standard operating procedures. The court concluded that the allegations that the defendants were on notice about the serious consequences that could result from such failures painted a story that "shocks the conscience sufficiently to withstand the District's motion [to dismiss]." *Id.* at 79.

Plaintiffs allege here that Defendants acted with deliberate indifference because they knew that Brentwood was contaminated with anthrax, yet, to keep the employees working, they continued to make affirmative misrepresentations concerning the facility's safety. Plaintiffs also allege that by not providing them with accurate information concerning the safety of the Brentwood facility and by "threatening, intimidating, and/or coercing" them to continue working at the anthrax-contaminated facility, Defendants made Plaintiffs "more vulnerable to the danger of anthrax contamination." Pls.' Surreply at 6. In addition, Plaintiffs have alleged a series of events that they argue demonstrate that Defendants were put on notice "that anthrax spores sent through the mail could penetrate the sides of a sealed envelope during processing at the Brentwood facility and, thereby, cause serious injury and/or death to Plaintiffs .... " *Id.* at 39.

■ The Court has given considerable thought to Plaintiffs' arguments. If the facts are as alleged, the conduct of USPS managers would appear commendable for their dedication to getting the mail out but deplorable for not recognizing the potential human risk involved. Just as in *Butera* and *Phillips*, these alleged actions demonstrated a gross disregard for a dangerous situation in which "actual deliberation [was] practical." *Butera*, 235 F.3d at 652 (citation omitted). It is alleged that Defendants "had been put on notice of the serious consequences that could result" from Plaintiffs' exposure to anthrax yet, despite such knowledge, Defendants en-

gaged in a campaign of misinformation designed to keep the employees at work. *Phillips*, 257 F.Supp.2d at 79. As noted by the Supreme Court in *Lewis*, " '[w]hen opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking.' " *Id.* at 77 (quoting *Lewis*, 523 U.S. at 844, 118 S.Ct. 1708). The Court therefore finds that Plaintiffs have sufficiently alleged that Defendants' conduct amounted to deliberate indifference, which violated their substantive due-process rights under the State Endangerment theory.

Defendants' reliance on cases such as *Collins* and *Washington* to support their proposition that "the 'state endangerment' theory of *Butera* cannot be applied to the plaintiffs' allegations concerning a federal workplace," Defs.' Reply at 8, is misguided. In *Washington*, the D.C. Circuit Court of Appeals refused to impose constitutional liability where the plaintiff prison guard alleged that he was injured at work as a result of the failure of the District to remedy unsafe conditions at the prison. The court explained:

> Prison guards, unlike the prisoners in their charge, are not held in state custody. Their decision to work as guards is voluntary. If they deem the terms of their employment unsatisfactory, e.g., if salary, promotion prospects, or safety are inadequate, they may seek employment elsewhere. The state did not force [the plaintiff] to become a guard, and the state has no constitutional obligation to protect him from the hazards *inherent in that occupation.*

*Id.* at 1482 (emphasis added); *see also Fraternal Order of Police*, 375 F.3d at 1146. Unlike the plaintiffs in *Washington*, however, Plaintiffs here are not seeking constitutional redress based on Defendants' failure to protect them from a hazard that was "inherent" in their occupation. While it is true that Defendants did

not force Plaintiffs to become postal workers, potential exposure to anthrax is not a danger that one would reasonably anticipate when accepting employment at a post office. *But see Richmond,* No. 03 Civ. 018, slip op. at 17 ( keeping the Brentwood facility open did not constitute the deprivation of an actual constitutional right).

Although the *Washington* court severely limited the extent to which government employers can be held constitutionally liable for injuries sustained by their employees, the Supreme Court's subsequent decision in *Collins* flatly rejected the notion that a government employee can never assert a substantive due-process claim against the government. *See* 503 U.S. at 120, 112 S.Ct. 1061 (noting that the Due Process Clause "afford[s] protection to employees who serve the government as well as to those who are served by them, and 1983 provides a cause of action for all citizens injured by an abridgement of those protections."); *see also Phillips,* 257 F.Supp.2d at 78. Thus, the Court finds that the relevant case law does not preclude Plaintiffs' substantive due-process claims under the State–Endangerment theory.

### 3. Defendants Are Entitled To Qualified Immunity.

While Plaintiffs have sufficiently alleged that Defendants' conduct violated their substantive due-process rights, the inquiry into potential liability does not stop there. Defendants argue that they are shielded from liability because there was no "pre-existing law" making it apparent that their alleged conduct would violate the Due Process Clause. Defs.' Mot. at 22. Accordingly, Defendants contend that they are entitled to dismissal of Plaintiffs' claims under the doctrine of qualified immunity.

▮ Qualified immunity shields State officials from constitutional liability when "their conduct does not violate clearly es-

tablished statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). If a plaintiff sufficiently alleges that a State official's conduct violated a constitutional right, "the next ... step is to ask whether the right was clearly established." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). "A constitutional right was 'clearly established' at the time of the events in question only if '[t]he contours of the right [were] sufficiently clear that a reasonable officer would understand that what he [was] doing violate[d] that right.'" *Butera,* 235 F.3d at 646 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Underlying the doctrine of qualified immunity is the principle of fair notice. *Moore v. Hartman,* 388 F.3d 871, 876–77 (D.C.Cir.2004). "[T]he unfairness of holding officials responsible on grounds they could not have anticipated trumps the individual's interest in vindicating transgressed rights." *Id.* (citations omitted). Thus, a case should be dismissed where a State official was not on notice that his conduct was clearly unlawful. *See Saucier,* 533 U.S. at 202, 121 S.Ct. 2151.

In this case, Plaintiffs allege that they have a constitutional right arising under the State Endangerment theory. As discussed earlier, in light of this circuit's decision in *Butera v. District of Columbia,* Plaintiffs have sufficiently alleged a deprivation of a constitutional right. However, the contours of the constitutional duty arising under the State Endangerment theory were not sufficiently clear at the time of Defendants' alleged conduct such that they would understand that what they were doing violated Plaintiffs' rights. *See Anderson,* 483 U.S. at 640, 107 S.Ct. 3034.

In *Butera,* the Court of Appeals concluded, "Butera's constitutional right to protec-

tion by the District of Columbia from third party violence was not clearly established" at the time that the events occurred. *Butera*, 235 F.3d at 652. The Court noted that the State Endangerment theory was not previously recognized in this circuit and that the only Supreme Court authority to support the concept "consisted of the often-quoted dictum in *DeShaney*." *Id.* Accordingly, the court determined that the defendant officers were entitled to qualified immunity. *Id.* at 654.

Although this circuit has now recognized the State Endangerment theory, there continues to be "little consistency in courts' explanations of the types of actions that would amount to constitutional liability" under this theory. *Id.* at 653; *see Richmond*, No. 03 Civ. 018, slip op. at 18 ("An analysis of our circuit's post-*Butera* cases shows that a broad reading of the State Endangerment concept is still far from 'clearly established.'"). Perhaps most importantly, the case law in this circuit is still unclear as to whether the State Endangerment theory can apply to an individual who voluntarily participated in the activity that ultimately caused him harm. *See Butera*, 235 F.3d at 654 (not deciding whether State liability "would necessarily be eliminated or mitigated" in situations where the victim's participation was "arguably voluntary"). Thus, in the context of government employment, decisions in this circuit have come to different conclusions concerning the extent to which govern-ment officials can be held constitutionally liable under the State Endangerment theory for injuries sustained by government employees. *Compare Fraternal Order of Police*, 375 F.3d at 1146–47 (holding that "special circumstances" are necessary for a State official's conduct to rise to a constitutionally-shocking level in the employment context) *with Phillips*, 257 F.Supp.2d at 78–79 (concluding that a government employer's "deliberate indifference" was sufficient to "shock the conscience").[12]

■ Based on the lack of clarity surrounding the exact contours of the State Endangerment theory in this circuit, this Court cannot unequivocally say that "in the light of preexisting law[,] the unlawfulness [of Defendants' alleged conduct] [ ][was] apparent." *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034. Because the law was insufficiently clear in October of 2001 to alert Defendants to possible constitutional liability for their conduct surrounding the alleged misinformation to Brentwood employees, Defendants are entitled to qualified immunity.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs' claims will be dismissed and the Court will enter judgment in favor of Defendants. A separate Order accompanies this Memorandum Opinion.

---

12. In *Richmond v. Potter, et al.*, a recent decision of this court that arose out of the same set of facts as the instant case, Judge Colleen Kollar–Kotelly concluded that the plaintiff could not show that Defendants' conduct in keeping the Brentwood Facility open constituted the deprivation of an actual constitutional right. *See* No. 03 Civ. 018, slip op. at 17. The court acknowledged, however, that the law in this area was unclear and that "*Butera* might be read in a more expansive manner," in which case the plaintiff may be able to allege that the defendants' conduct amounted to a constitutional violation. *Id.* However, the court ultimately determined that even if the plaintiff could sufficiently allege a substantive due-process violation, "Plaintiff still cannot show that it was 'clearly established' that Defendants would have been aware that their conduct was unlawful." *Id.* at 19.