Lombardi v. Whitman

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2006

(Argued: November 27, 2006     Decided: April 19, 2007)

Docket No. 06-1077-cv

- - - - - - - - - - - - - - - - - - -x

JOHN LOMBARDI, ROBERTO RAMOS JR., HASAN
A. MUHAMMAD, RAFAEL A. GARCIA and
THOMAS E. CARLSTROM, individually and
as representatives of a class of
individuals similarly situated,

                Plaintiffs-Appellants,

          - v.-

CHRISTINE T. WHITMAN, in her individual
capacity, JAMES L. CONNAUGHTON, in his
individual capacity, EILEEN McGINNIS,
in her individual capacity, WILLIAM J.
MUSZYNSKI, in his individual capacity,
JOHN L. HENSHAW, in his individual
capacity, SAMUEL THERNSTROM, in his
individual capacity, and JOHN DOES, 1-
10, in their individual capacities,

                Defendants-Appellees.

- - - - - - - - - - - - - - - - - - -x

Before:   JACOBS, Chief Judge, SACK, and RAGGI, Circuit
          Judges.

     Appeal from a judgment of the United States District

Court for the Southern District of New York (Hellerstein,

J.) entered on February 6, 2006, granting the defendants'
motion to dismiss for failure to state a claim.

Affirmed.

STEPHEN J. RIEGEL, Weitz &
Luxemberg, P.C., New York, NY, for
Plaintiffs-Appellants.

MARK B. STERN, Appellate Staff,
Civil Division, United States
Department of Justice (Peter D.
Keisler, Assistant Attorney General
of the United States, Alisa Klein,
Scott A. Hershovitz, on the brief),
Washington, DC, for
Defendants-Appellees.

DENNIS JACOBS, Chief Judge:

The five plaintiffs performed search, rescue and clean-up work at the World Trade Center site (the "site") in the aftermath of the September 2001 terrorist attacks. They allege that the defendants, all of them federal officials, issued reassuring--and knowingly false--announcements about the air quality in lower Manhattan; that the plaintiffs therefore believed it was safe to work at the site without needed respiratory protection, and did; and that the defendants' conduct violated plaintiffs' right to substantive due process. This is an appeal from a February 6, 2006 order entered in the United States District Court for the Southern District of New York (Hellerstein, J.),

which dismissed the complaint.  We affirm because the complaint's allegations do not shock the conscience even if the defendants acted with deliberate indifference: when agency officials decide how to reconcile competing governmental obligations in the face of disaster, only an intent to cause harm arbitrarily can shock the conscience in a way that justifies constitutional liability.

**BACKGROUND**

The facts are drawn from the complaint, the documents referenced therein, and common knowledge of the events of September 11, 2001.

The collapse of the World Trade Center towers on that day generated a cloud of debris that coated the surrounding buildings and streets of Lower Manhattan with concrete dust, asbestos, lead, and other building materials.  Fires within the wreckage burned for months, emitting various metals and particulate matter in addition to such potentially harmful substances as dioxin, polychlorinated biphenyls (PCBs), volatile organic compounds (VOCs), and polycyclic aromatic hydrocarbons (PAHs).

The plaintiffs arrived at the site on September 11 or in the days soon after:  John Lombardi is a New York Army

-3-

National Guard medic; Roberto Ramos, Jr. is an Emergency Services Officer in the New York City Corrections Department; Hasan A. Muhammad is an Emergency Services Captain in the New York City Corrections Department; Rafael A. Garcia is a Deputy U.S. Marshal; and Thomas E. Carlstrom is a paramedic in the New York City Fire Department. They participated in search, rescue, and clean-up work at the site, with little or no equipment to protect their lungs. They were not told by their employers or any government official about the health risks posed by the dangerous contaminants in the air, and they thought they could work at the site with little or no respiratory protection based on the information available to them, including statements of government officials indicating that Lower Manhattan's air quality presented no significant health risks to the public.

The plaintiffs brought suit on November 23, 2004, in the Southern District of New York, on their own behalf and on behalf of a purported class including all those who worked at or in the immediate vicinity of the site during the period September 11, 2001, to October 31, 2001, who did so without sufficient respiratory equipment in reliance on information supplied by government officials, and who as a result suffer or reasonably fear suffering illness or injury

from their exposure to asbestos or other harmful substances.

The defendants, sued in their individual capacities, are current or former officials of the Environmental Protection Agency ("EPA"), the White House Council on Environmental Quality ("CEQ"), and the Occupational Safety and Health Administration ("OSHA"). The claims against them are based on statements in EPA press releases issued in the wake of the disaster, which (according to the complaint) were made (1) to speed work at the site, (2) with the knowledge they were false or misleading, and (3) with deliberate indifference to the health risks the workers would incur by relying on them.

**A.    The Allegedly Misleading Statements**

The complaint invokes a report issued by the EPA Office of the Inspector General, which critiques the EPA's response to the September 11 disaster. See EPA Office of the Inspector General, "EPA's Response to the World Trade Center Collapse: Challenges, Successes, and Areas for Improvement," Report No. 2003-P-00012 (Aug. 21, 2003), available at http://www.epa.gov/oig/reports/2003/WTC_report_20030821.pdf

(last visited April 17, 2007) (the "OIG Report").[1]

A September 13, 2001, EPA press release, which is cited in the OIG Report, [i] indicated that initial environmental tests done at the site after the terrorist attacks were "very reassuring about potential exposure of rescue crews and the public to environmental contaminants"; [ii] concluded that the results of "[a]dditional sampling of both ambient air quality and dust particles . . . in lower Manhattan . . . were uniformly acceptable"; and [iii] expressed the EPA's intent to work with other agencies and rescue workers to provide respiratory equipment and to make sure they observed appropriate safety precautions-- assistance that the plaintiffs allege (to their knowledge) never materialized. OIG Report at 87-88.

A September 16 EPA press release reported additional good news:

---

[1] Both the OIG Report and the EPA press releases, which are attached to the OIG Report as appendices, <u>see</u> Supplemental Appendices to OIG Evaluation Report, <u>available at</u> http://www.epa.gov/oig/reports/2003/wtc/toc.htm (last visited April 17, 2007), are public documents on which the complaint heavily relies; and plaintiffs' counsel indicated to the district court at oral argument that the OIG Report was incorporated into the complaint. Mot. to Dismiss Hr'g Tr. 32, <u>Lombardi v. Whitman</u>, No. 04-CV-9272 (S.D.N.Y. Feb. 2, 2006). In ruling on the motion to dismiss, the district court was therefore permitted to consider the entire contents of these documents, as do we. <u>See</u> <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 153 (2d Cir. 2002).

[N]ew samples confirm previous reports that ambient air quality meets OSHA standards and consequently is not a cause for public concern. New OSHA data also indicates that indoor air quality in downtown buildings will meet standards. EPA has found variable asbestos levels in bulk debris and dust on the ground, but EPA continues to believe that there is no significant health risk to the general public in the coming days. Appropriate steps are being taken to clean up this dust and debris. "Our tests show that it is safe for New Yorkers to go back to work in New York's financial district," said John L. Henshaw, Assistant Secretary of Labor for OSHA. "Keeping the streets clean and being careful not to track dust into buildings will help protect workers from remaining debris."

Id. at 85.

A September 18 press release reported that EPA's testing of the air and drinking water showed that "these vital resources are safe" and that the "vast majority" of air samples taken near the site measured harmful substances at below maximum acceptable levels. According to the release, the highest asbestos levels were close to the site itself, where rescue and cleanup workers were supposedly being supplied with adequate equipment. The same release quoted defendant Whitman:

"We are very encouraged that the results from our monitoring of air quality and drinking water conditions in both New York and near the Pentagon show that the public in these areas is not being exposed to excessive levels of asbestos or other harmful substances," Whitman said. "Given the scope of the tragedy from last week, I am glad to

reassure the people of New York and Washington, D.C. that their air is safe to breath [sic] and their water is safe to drink," she added.

Id. at 77. In fact, according to the EPA Inspector General, 25 percent of the bulk dust samples taken up to that point recorded asbestos at levels representing a significant health risk. See id. at 14.

Press releases issued on September 21, October 3, and October 30--as well as a statement made by an EPA spokesperson to the New York Daily News on or about October 11--all reiterated the message that testing and sampling done near the site indicated no significant health risk to the public. See Compl. ¶¶ 49-51.

The OIG Report suggests that: [i] the EPA's press releases conveyed the dominant message that there was no risk to public health without necessary qualifying statements about, for instance, the initial lack of monitoring data for many harmful substances besides asbestos, see OIG Report at 9-11; [ii] the EPA did not disclose publicly that it lacked adequate benchmarks for measuring the long term health effects of each substance or the combination of them in the unprecedented conditions created by the disaster, see id. at 9-13; [iii] the EPA's reassuring statements were interpreted by some to apply to

site workers as well as the public, see id. at 43-44; [iv] the EPA and other agencies sent mixed messages to workers about the need for respirators, see id. at 43-45; and [v] the EPA's decisions as to what information to release were heavily influenced by suggestions from the CEQ, see id. at 14-17. See Compl. ¶¶ 52-57.

As to the last point, a September 12 internal EPA email directed that all statements to the media were to be cleared by the National Security Council before release, and the OIG Report indicates that an official in the CEQ was the conduit through which this clearance was granted, OIG Report at 15; a comparison of draft press releases with their final counterparts reveals that the CEQ suggested edits that removed cautionary wording (for instance, in the September 13 press release, a portion of the title was changed from "[EPA] Testing Terrorized Sites for Environmental Hazards" to "[EPA] Reassures Public About Environmental Hazards"), id. at 17; and in response to the CEQ's suggestions about the September 16 press release, the EPA [i] removed a reference to recent test samples that recorded higher asbestos levels than those in previous samples and [ii] added a quote from John L. Henshaw of OSHA assuring that it was safe to go to work in Lower Manhattan, id. at 16.

-9-

The press releases were not without cautionary language: they referred to the EPA's plan for continued monitoring efforts; and early press releases warned of the need to take certain cautionary measures--for instance, to change air conditioning filters, sweep up debris, and wet down buildings covered in debris to avoid its becoming airborne.

**B.   The District Court Proceedings**

Defendants moved to dismiss the complaint on March 21, 2005, and the district court granted the motion from the bench on February 2, 2006,[2] holding that the defendants had not alleged the violation of a constitutional right and holding alternatively that the defendants in any event enjoyed qualified immunity because they had not violated a right that was clearly established at the time of their conduct.  As to two plaintiffs, dismissal was granted on a further alternative ground that "special factors" counseled hesitation in the creation of a cause of action under <u>Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics</u>, 403 U.S. 388 (1971).  Specifically: (1) Lombardi's claim was

---

[2] The district court dismissed without certifying the purported class.

dismissible because military personnel may not use a § 1983 or <u>Bivens</u> action to obtain redress for injuries suffered incident to military service, <u>see</u> <u>United States v. Stanley</u>, 483 U.S. 669, 681 (1987) (<u>Bivens</u> action by U.S. military personnel); <u>Jones v. N.Y. State Div. of Military & Naval Affairs</u>, 166 F.3d 45, 50-52 (2d Cir. 1999) (§ 1983 action by state National Guardsman); and (2) Garcia's claim was dismissible because he already had the remedy afforded to U.S. Marshals under the Federal Employees' Compensation Act, <u>see generally</u> <u>Schweiker v. Chilicky</u>, 487 U.S. 412, 424-29 (1988); <u>Hudson Valley Black Press v. IRS</u>, 409 F.3d 106, 110-14 (2d Cir. 2005).

In assessing the due process claim, the district court emphasized that the "administration had to deal with a situation of concern, of fear [for] safety, of a need to get on with [the] work of the community, to avoid an economic catastrophe as well as a physical catastrophe to the City of New York, and what was said was said." Mot. to Dismiss Hr'g Tr. 49, <u>Lombardi v. Whitman</u>, No. 04-CV-9272 (S.D.N.Y. Feb. 2, 2006).

**DISCUSSION**

We review a dismissal for qualified immunity "<u>de novo</u>,

-11-

accepting as true the material facts alleged in the complaint and drawing all reasonable inferences in plaintiffs' favor." Johnson v. Newburgh Enlarged School Dist., 239 F.3d 246, 250 (2d Cir. 2001).

The Constitution itself does not explicitly provide a damages remedy to redress violations by individual federal officials. And sovereign immunity bars suit for damages against the federal government itself unless it has waived that immunity. But where an individual "has been deprived of a constitutional right by a federal agent acting under color of federal authority," the individual may bring a so-called Bivens action for damages against that federal agent in an individual capacity, Thomas v. Ashcroft, 470 F.3d 491, 496 (2d Cir. 2006), provided that Congress has not forbidden such an action and that the situation presents "no special factors counselling hesitation in the absence of affirmative action by Congress," Hudson Valley Black Press, 409 F.3d at 108 (quoting Bivens, 403 U.S. at 396).

A federal executive official is entitled to invoke qualified immunity as a defense against a Bivens action. See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity analysis in Bivens suits is the same two-step analysis applied in § 1983 suits against state actors.

-12-

See Wilson v. Layne, 526 U.S. 603, 608 (1999). First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201 (2001). Second, was the right so clearly established that a reasonable government official would have known that her conduct violated a constitutional right "in light of the specific context of the case, [and] not as a broad general proposition[?]" Id.

The threshold inquiry is therefore whether the complaint alleges the violation of a constitutional right.

**A.    Substantive Due Process**

Under the Due Process Clause of the Fifth Amendment of the Constitution, "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. This clause has been interpreted as a "protection of the individual against arbitrary action of government," County of Sacramento v. Lewis, 523 U.S. 833, 845 (1998) (quoting Wolff v. McDonnell, 418 U.S. 539, 558 (1974)), which has both a procedural component protecting against the "denial of fundamental procedural fairness," id. at 845-46, as well as a substantive component guarding the

-13-

individual against "the exercise of power without any reasonable justification in the service of a legitimate governmental objective," id. at 846. The substantive component of due process encompasses, among other things, an individual's right to bodily integrity free from unjustifiable governmental interference. See Washington v. Glucksberg, 521 U.S. 702, 720 (1997) (citing Rochin v. California, 342 U.S. 165 (1952)). The Due Process Clause, however, "does not transform every tort committed by a state actor into a constitutional violation." DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 202 (1989). Government action resulting in bodily harm is not a substantive due process violation unless "the government action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" Pena v. DePrisco, 432 F.3d 98, 112 (2d Cir. 2005) (quoting Lewis, 523 U.S. at 847 n.8).

**B. Misrepresentation and "State Created Danger"**

Only an affirmative act can amount to a violation of substantive due process, because the Due Process Clause "is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and

security." DeShaney, 489 U.S. at 195. It is not enough to allege that a government actor failed to protect an individual from a known danger of bodily harm or failed to warn the individual of that danger. See Collins v. City of Harker Heights, 503 U.S. 115, 125-29 (1992) (no due process violation where plaintiff alleged the city failed to properly train or warn its employees of known dangers that resulted in sanitation worker's asphyxiation). So, to the extent the plaintiffs here allege that the defendants had an affirmative duty to prevent them from suffering exposure to environmental contaminants, their claims must fail. They cannot rely on the EPA's failure to instruct workers to wear particular equipment, its failure to explain the exact limitations of its knowledge of the health effects of the airborne substances that were present, or its failure to explain the limitations of its testing technologies.

But the complaint goes further; it alleges that defendants' affirmative assurances that the air in Lower Manhattan was safe to breathe created a false sense of security that induced site workers to forgo protective measures, thereby creating a danger where otherwise one would not have existed. "[I]n exceptional circumstances a governmental entity may have a constitutional obligation to

-15-

provide . . . protection, either because of a special relationship with an individual, or because the governmental entity itself has created or increased the danger to the individual." Ying Jing Gan v. City of New York, 996 F.2d 522, 533 (2d Cir. 1993) (citing DeShaney, 489 U.S. at 198, 201). The plaintiffs allege no "special relationship" between them and federal officials.[3] They plead that their reliance on the government's misrepresentations induced them to forgo available safeguards, and thus characterize the harm as a state created danger.

Where a government official takes an affirmative act that creates an opportunity for a third party to harm a victim (or increases the risk of such harm), the government official can potentially be liable for damages. See, e.g., Pena, 432 F.3d at 108; Hemphill v. Schott, 141 F.3d 412, 419

_____

[3] Special relationships arise ordinarily if a government actor has assumed an obligation to protect an individual by restricting the individual's freedom in some manner, as by imprisonment. Such considerations are less relevant where a plaintiff alleges a "state created danger":

> Whether or not a victim was in state custody will surely be relevant to the state's duty to protect. But because this Circuit treats the "state created danger" exception [considered here] as distinct from the "special relationship" exception, the fact that the victims were not in state custody at the time of the accident is irrelevant here.

Pena, 432 F.3d at 113 n.22.

-16-

(2d Cir. 1998); <u>Dwares v. City of New York</u>, 985 F.2d 94, 98-99 (2d Cir. 1993).  However, the danger alleged in this case is dissimilar from the state created dangers recognized in our precedents; in each of those cases, a third party's criminal behavior harmed the plaintiff after a government actor--always a law enforcement officer--enhanced or created the opportunity for the criminal act through some interaction or relationship with the wrongdoer.  <u>See</u> <u>Pena</u>, 432 F.3d at 109 (opining that "'special relationship' liability arises from the relationship between the state and a particular victim, whereas 'state created danger' liability arises from the relationship between the state and the private assailant.").  In <u>Dwares</u>, the police allegedly gave the green light for skinheads to assault a group of flag-burners; in <u>Hemphill</u>, the police allegedly gave back a robbery victim's gun and took him along on a chase after the robber, who was shot by the robbery victim; in <u>Pena</u>, the police allegedly encouraged drinking and driving by a fellow officer who hit several pedestrians while under the influence.

In this case, the defendants acted only after the terrorists' criminal acts were complete; <u>i.e.</u>, plaintiffs' claims are based neither on any alleged encouragement of the

-17-

terrorists nor on any relationship between defendants and the terrorists. Instead, plaintiffs appear to cast environmental conditions as the wrongdoer. They submit that the defendants, with knowledge of the serious health risks posed by these conditions, falsely represented to the public that it was safe from any such risks.

The closest analogy in other circuits' substantive due process case law--and it is not particularly close--is to cases in which statements by law enforcement officials give an individual a false sense of security as to the necessity of self-help. See, e.g., Kennedy v. City of Ridgefield, 439 F.3d 1055, 1062-63 (9th Cir. 2006) (holding that a complaint adequately alleged state created danger where plaintiff reported to police that her neighbor was a child molester and the police violated promises to patrol the neighborhood and to warn her before they talked to the neighbor); Gazette v. City of Pontiac, 41 F.3d 1061, 1065-66 (6th Cir. 1994) (holding that causation was too attenuated to support a due process claim where daughter alleged she herself would have found evidence at the site of her mother's disappearance-- and had a chance of saving her mother--but for the police's

false claim that they had found nothing after a search).[4]

Depending on the circumstances, these cases furnish some support for the idea that a substantive due process violation can be made out when a private individual derives a false sense of security from an intentional misrepresentation by an executive official if foreseeable bodily harm directly results and if the official's conduct shocks the conscience. Taking the allegations of the complaint as true, as we must, we assume that a sufficient causal connection exists between the defendants' optimistic statements and the plaintiffs' exposure to toxic substances. However, the point is fairly debatable; as the Supreme Court cautioned in evaluating a substantive due process claim

---

[4] Some circuits have rejected factually similar claims, reasoning that whether or not an officer has expressed an intent to protect a plaintiff, the failure to provide such protection is not a substantive due process violation unless the plaintiff is restrained from acting on his own behalf. See Bright v. Westmoreland County, 443 F.3d 276, 284 (3d Cir. 2006) (holding that, because the plaintiff's freedom to defend his family was not impaired, there was no substantive due process violation where his daughter was murdered by a person whom the police previously assured plaintiff they would arrest), cert. denied, 127 S. Ct. 1483 (2007); Pinder v. Johnson, 54 F.3d 1169, 1175-76 (4th Cir. 1995) (in banc) (rejecting due process claim where a policeman falsely assured plaintiff that her violent former paramour would be jailed overnight, because there was no "limitation imposed on her liberty"). Both Bright and Pinder rejected the argument that a citizen's reliance on an officer's promises could constitute a state created danger.

based on legislative action,

> [a governmental] decision that has an incremental impact on the probability that death will result in any given situation . . . cannot be characterized as state action depriving a person of life just because it may set in motion a chain of events that ultimately leads to the random death of an innocent bystander.

Martinez v. California, 444 U.S. 277, 281 (1980). See also Bright, 443 F.3d at 281 (a state created danger cause of action is only cognizable where "the harm ultimately caused was foreseeable and fairly direct") (quoting Kneipp v. Tedder, 95 F.3d 1199, 1208 (3d Cir. 1996)). We put aside the vexed issue of causation[5]; instead, we decide the case

---

[5] The complaint here raises difficult questions about causation and the reasonableness of reliance that would likely be obstacles for the plaintiffs if the complaint were to be reinstated. For example: (1) whether the plaintiffs actually read or believed the press releases on which their claims are based; (2) whether the press releases were specific and optimistic enough to induce reasonable reliance; (3) whether, absent the defendants' statements, the plaintiffs would have refused to work if adequate respiratory equipment was unavailable when they demanded it; (4) whether the plaintiffs' experience at the site gave them sufficient first-hand information that harmful substances were in the air; (5) whether the plaintiffs' use of the limited respiratory equipment that was made available to them would have abated the risk of illness; and (6) whether the defendants' statements were subjected to public challenges that would have alerted a prudent worker to the need for protective equipment. The complaint implicitly alleges that the absence of reassuring EPA press releases would in itself have saved the plaintiffs from working without adequate protection. But it is unclear when the plaintiffs read--or heard of--the defendants' statements; the well-hedged allegation is that the plaintiffs exposed

-20-

on the ground that the conduct alleged, even assuming causation, does not shock the conscience.

**C.    Conscience-Shocking Conduct**

In order to shock the conscience and trigger a violation of substantive due process, official conduct must be outrageous and egregious under the circumstances; it must be truly "brutal and offensive to human dignity . . . ." Smith v. Half Hollow Hills Cent. School Dist., 298 F.3d 168, 173 (2d Cir. 2002) (quoting Johnson v. Glick, 481 F.2d 1028, 1033 & n.6 (2d Cir. 1973)) (internal quotation marks omitted).  Courts have "always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended."  Collins, 503 U.S. at 125.

In gauging the shock, "negligently inflicted harm is categorically beneath the threshold," while "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."  County of

themselves to environmental contaminants "in direct or indirect reliance upon" the defendants' statements, at least in part through the "dissemination of such statements by third parties."  Compl. ¶¶ 1, 63 (emphasis added).

-21-

Sacramento v. Lewis, 523 U.S. 833, 849 (1998).  In between, the Supreme Court has recognized that conduct exhibiting "deliberate indifference" to harm can support a substantive due process claim, with a potent qualification that has bearing here:

> Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience-shocking.

Id. at 850.  The conscience recognizes the dilemma of conflicting obligations.  In the apparent absence of harmless options at the time decisions must be made, an attempt to choose the least of evils is not itself shocking.

In Lewis, the Supreme Court held that the "deliberate indifference" of police officers who risk the lives of suspects by engaging in high speed pursuit cannot be deemed conscience-shocking, because they "have obligations that tend to tug against each other" and because "[t]hey are supposed to act decisively and to show restraint at the same moment, and their decisions have to be made 'in haste, under pressure, and frequently without the luxury of a second chance.'"  Id. at 853 (quoting Whitley v. Albers, 475 U.S. 312, 320 (1986)).  Police conduct in such events does not

-22-

shock the conscience unless there is "intent to harm suspects physically or to worsen their legal plight." Id. at 854. By contrast, prison officials' deliberate indifference to inmate welfare in non-emergency situations can be conscience-shocking because the officials have "time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations." Id. at 853. The duty of a prison official in such a situation "does not ordinarily clash with other equally important governmental responsibilities," Whitley, 475 U.S. at 320, because no "substantial countervailing interest excuse[s] the State from making provision for the decent care and protection of those it locks up . . . ." Lewis, 523 U.S. at 851.

The plaintiffs do not allege that the defendants acted with an evil intent to harm; but they argue that the defendants' deliberate indifference shocks the conscience because the defendants made their decisions in an "unhurried" fashion with "hours, days, weeks and even months to contemplate, deliberate, discuss and decide what to do and say about the health hazards posed to thousands of people who were coming onto and working at Ground Zero." Appellants' Br. 39-40.

The decisions alleged were made by the defendants over a period of time rather than in the rush of a car chase; but the decisions cannot on that account be fairly characterized as "unhurried" or leisured. The OIG Report (relied upon by the complaint) shows that the defendants were required to make decisions using rapidly changing information about the ramifications of unprecedented events in coordination with multiple federal agencies and local agencies and governments. See OIG Report at i ("Responding to this crisis required organizations from all levels of government to coordinate their response efforts and to make critical public health and safety decisions quickly, and without all of the data that decision-makers would normally desire."); cf. Kaucher v. County of Bucks, 455 F.3d 418, 426-27 & n.3 (3d Cir. 2006) ("We note defendants were under some pressure to respond quickly to the spread of infection [at the jail over a period of more than two years], and we question whether deliberately indifferent conduct is truly conscience shocking in this context.").

Hurried or unhurried, the defendants were subjected to the "pull of competing obligations." The complaint concedes that the alleged wrongs to the plaintiffs were committed in aid of competing public goals that were not insubstantial:

-24-

> Defendants caused to be made the aforesaid misleading statements and omissions . . . in order to insure that Plaintiffs and Class Members immediately began to perform search, recovery, clean-up and other work at the Ground Zero site immediately after the September 11, 2001 attacks, and to create the overall impression that it was safe for people residing and working in areas near Ground Zero to return to their normal lives.

Compl. ¶ 62. The complaint thus recognizes what everyone knows: that one essential government function in the wake of disaster is to put the affected community on a normal footing, i.e., to avoid panic, keep order, restore services, repair infrastructure, and preserve the economy.

In previous cases in which we recognized a state created danger, government officials were not subject to the pull of competing obligations. As to Pena, there is certainly no countervailing public benefit to the encouragement of drunk driving. See Pena v. DePrisco, 432 F.3d 98, 114 (2d Cir. 2005) ("Not condoning egregious drunk driving 'does not ordinarily clash with other equally important governmental responsibilities.'") (quoting Lewis, 523 U.S. at 852). And the active incitement of private violence against demonstrators in Dwares served no conceivable public interest; Dwares emphasized that the officers allegedly intended to punish the victims because of their political opinions. See Dwares v. City of New York,

-25-

985 F.2d 94, 99 (2d Cir. 1993) (the allegations in the complaint "would easily permit the finder of fact to infer that the officers intended the flag burners qua flag burners to suffer the injuries inflicted").

Beyond our own precedent, the plaintiffs direct us to two recent district court decisions that found conduct to be conscience-shocking on facts that are in one case somewhat similar, and in the other, identical. In Briscoe v. Potter, 355 F. Supp. 2d 30 (D.D.C. 2004), aff'd, 171 F. App'x 850 (D.C. Cir. 2005), postal employees who had contracted anthrax alleged that their supervisors had falsely told them that it was safe to return to work after anthrax had been discovered at their facility. The district court held that the supervisors' conduct was conscience-shocking: the supervisors were "commendable for their dedication to getting the mail out but deplorable for not recognizing the potential human risk involved. . . . [T]hese alleged actions demonstrated a gross disregard for a dangerous situation in which 'actual deliberation [was] practical.'" Id. at 46 (quoting Butera v. Dist. of Columbia, 235 F.3d 637, 652 (D.C. Cir. 2001)). The shock to the conscience notwithstanding, the due process claim was dismissed on qualified immunity, see 355 F. Supp. 2d at 48, and a

substantive due process claim arising from the same incident was dismissed in <u>Richmond v. Potter</u>, No. 03-00018, 2004 U.S. Dist. LEXIS 25374, at *19-29 (D.D.C. Sept. 30, 2004), <u>aff'd on other grounds</u>, 171 F. App'x 851 (D.C. Cir. 2005). Plaintiffs here allege harm similar to that suffered in <u>Briscoe</u>, but we need not decide whether <u>Briscoe</u> was correctly decided, because there is a salient ground for distinction: the need to process the mails at a single postal facility cannot be compared with the need to restore the residential, economic, educational and civic life of an entire community.

In <u>Benzman v. Whitman</u>, No. 04 Civ. 1888, 2006 WL 250527 (S.D.N.Y. Feb. 2, 2006), the district court considered substantive due process claims arising from the same press releases at issue in this case. Citing <u>Briscoe</u>, <u>Benzman</u> held that if the reassuring statements made by EPA officials were made with knowledge of their falsehood, they were unquestionably conscience-shocking based on the nature of the EPA's mandate:

> The EPA is designated as the agency in our country to protect human health and the environment, and is mandated to work for a cleaner, healthier environment for the American people. The agency enforces regulations regarding pollution in our environment and the presence of toxic and hazardous substances, and has endorsed and

-27-

promulgated regulations for hazardous and toxic materials, such as asbestos and lead. As head of the EPA, Whitman knew of this mandate and took part in and directed the regulatory activities of the agency. Given this responsibility, the allegations in this case of Whitman's reassuring and misleading statements of safety after the September 11, 2001 attacks are without question conscience-shocking.

Id. at *18 (footnote and citation omitted). We disagree with this reasoning, which focuses too narrowly on the mission of a single agency without considering the other substantial government interests at stake.[6]

If anything, the importance of the EPA's mission counsels against broad constitutional liability in this situation: the risk of such liability will tend to inhibit EPA officials in making difficult decisions about how to disseminate information to the public in an environmental emergency. Knowing that lawsuits alleging intentional misconduct could result from the disclosure of incomplete, confusingly comprehensive, or mistakenly inaccurate information, officials might default to silence in the face of the public's urgent need for information. This is

---

[6] The EPA's mandate is perhaps relevant to a determination of whether the defendants' conduct complied with the statutes and regulations governing that agency's operation, and we express no opinion on whether the defendants' conduct was appropriate or legal in this respect.

because, as the Supreme Court held in <u>Collins v. City of</u> <u>Harker Heights</u>, 503 U.S. 115, 125-29 (1992), a government official's failure to warn of a known danger, without more, does not violate substantive due process.

<u>Collins</u> also instructed that, at least in the § 1983 context, courts should operate from a "presumption that the administration of government programs is based on a rational decisionmaking process that takes account of competing social, political, and economic forces." <u>Id.</u> at 128. While § 1983 implicates issues of federalism that are not relevant here, the Court's instruction has force nonetheless: substantive due process liability should not be allowed to inhibit or control policy decisions of government agencies, even if some decisions could be made to seem gravely erroneous in retrospect. <u>Cf.</u> <u>United States v. Variq</u> <u>Airlines</u>, 467 U.S. 797, 814 (1984) (Federal Tort Claims Act discretionary function exception is designed to prevent "judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort").

Can the goals of a government policy possibly outweigh a known risk of loss of life or bodily harm? The EPA and other federal agencies often must decide whether to regulate

particular conduct by taking into account whether the risk to the potentially affected population will be acceptable. Such decisions require an exercise of the conscience, but such decisions cannot be deemed egregious, conscience-shocking, and "arbitrary in the constitutional sense," Collins, 503 U.S. at 129, merely because they contemplate some likelihood of bodily harm.

Moreover, mass displacement, civil disorder and economic chaos in an urban area also can result in bodily harm and loss of life. The relative magnitude of such risks cannot be reliably computed, and they are in any event incommensurable. Accepting as we must the allegation that the defendants made the wrong decision by disclosing information they knew to be inaccurate, and that this had tragic consequences for the plaintiffs, we conclude that a poor choice made by an executive official between or among the harms risked by the available options is not conscience-shocking merely because for some persons it resulted in grave consequences that a correct decision could have avoided. "[T]he touchstone of due process is protection of the individual against arbitrary action of government," which in the substantive manifestation of due process is exhibited by "the exercise of power without any reasonable

justification in the service of a legitimate governmental objective." Lewis, 523 U.S. at 845-46 (internal quotation omitted). When great harm is likely to befall someone no matter what a government official does, the allocation of risk may be a burden on the conscience of the one who must make such decisions, but does not shock the contemporary conscience.

These principles apply notwithstanding the great service rendered by those who repaired New York, the heroism of those who entered the site when it was unstable and on fire, and the serious health consequences that are plausibly alleged in the complaint.

* * *

Because the conduct at issue here does not shock the conscience, there was no constitutional violation. We therefore need not decide whether the conduct alleged violated law that was then clearly established, or whether any special factors counsel hesitation in the recognition of a Bivens action against the defendants. For the foregoing reasons, we affirm.