06-1983-cv
Matican v. City of New York

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

------------

August Term 2007

Argued: October 22, 2007        Decided: April 23, 2008

Docket No. 06-1983-cv

-----------------------------------------------------X

ROBERT MATICAN,

Plaintiff-Appellant,

- against -

CITY OF NEW YORK, JOHN SCHNEIDER,
JULIO C. ORDONEZ, and CHRIS ZIMMERMAN,

Defendants-Appellees.

-----------------------------------------------------X

Before:   FEINBERG, WINTER, and STRAUB, Circuit Judges.

Plaintiff-appellant, who participated in a police sting and was later assaulted by the target of the sting, asserted that conduct of defendants-appellees constituted both denial of substantive due process and negligence, and brought claims under 42 U.S.C. § 1983 and state common law. The district court granted summary judgment to defendants-appellees on the federal claims and declined to exercise jurisdiction over the state-law claims. Judgment affirmed.

> MICHAEL A. HASKEL, Mineola, N.Y., for Plaintiff-Appellant.
>
> JOHN HOGROGIAN, Assistant Corporation Counsel (EDWARD F.X. HART, HEIDI GROSSMAN, JENNIFER ROSSAN, of counsel, MICHAEL A. CARDOZO, Corporation Counsel of the City of New York, on the brief), New York, N.Y., for Defendants-Appellees.

FEINBERG, Circuit Judge:

Plaintiff-appellant Robert Matican participated in a sting to help officers of the New York Police Department ("NYPD") arrest a suspected drug dealer: Matican set up a drug buy, and the police descended on the dealer in force when he arrived about an hour later. After the dealer was released on bail, he assaulted plaintiff Matican with a box cutter, injuring him severely. Matican sued the City of New York ("City") and three individual NYPD officers –- Captain Julio C. Ordonez, Lieutenant John Schneider, and Sergeant Chris Zimmerman (collectively, "the officers") –- arguing that the way they conducted the sting and their failure to alert Matican to the dealer's release gave away Matican's identity and left him in peril. He asserted claims for damages under 42 U.S.C. § 1983 and New York state law. By memorandum and order dated March 28, 2006, the United States District Court for the Eastern District of New York (Block, J.) granted defendants-appellees' motion for summary judgment on the § 1983 claims and declined to exercise supplemental jurisdiction over the state-law claims. For the reasons stated below, we affirm the judgment of the district court.

I. BACKGROUND

For purposes of Matican's appeal from a grant of summary judgment, we take his allegations as true and draw all reasonable inferences in his favor. Jenkins v. City of New York, 478 F.3d 76, 85 n.4 (2d Cir. 2007).

On the evening of September 18, 2001, Matican purchased crack cocaine from a drug dealer he knew as "Mike," who had supplied him with drugs on a number of prior occasions. Undercover NYPD officers then arrested Matican and took him to a precinct house in Bayside, Queens. While Matican was in a holding cell, defendant Zimmerman approached him and offered to make the arrest "go away" if Matican would agree to help the officers arrest Mike. Matican was interested in the offer but expressed concern for his safety if Mike made bail. Matican testified that Zimmerman responded, "Don't worry, Robert, we will look after you. We will protect you." Matican agreed to cooperate based on Zimmerman's promise.

According to Matican, Zimmerman then instructed Matican to arrange a drug buy with Mike the following evening in front of the Bayside Jewish Center, a frequent location for prior drug transactions between Matican and Mike. The police would be waiting with two cars and four officers in each car. When Mike executed his customary illegal U-turn in front of the Jewish Center, Matican would identify the car from the safety of a darkened athletic field across the street, and the police would

pull over Mike as if for a routine traffic stop. Defendant Schneider asked Matican what quantity of drugs Mike would be carrying; when Matican replied that Mike would have 20 or 30 bags of crack, Schneider replied, "[I]f he has that many bags, he is not going to even make bail." After the plan was formulated, the officers released Matican with a desk appearance ticket.

The following evening, Matican met the officers at the prearranged location and paged Mike to arrange a large drug buy. Mike arrived and Matican identified his car, as planned. According to Matican, the officers then cut Mike off with two police vehicles, pulled him from the driver's seat, and pinned him against his car. The officers searched Mike's person and car, discovered drugs, and arrested him. Matican remained hidden and unseen in the darkened field.

Mike, whose real name was Steven Delvalle, was found to be in possession of 16 bags of crack cocaine, two bags of marijuana, and about $2,000 in cash. Delvalle was charged with two counts of criminal possession of a controlled substance, as well as various moving violations. A criminal check performed at the precinct revealed that Delvalle had six prior arrests, including arrests for possession of a handgun and assault with a box cutter. On September 28, 2001, Delvalle was released on bail. Matican was not informed of Delvalle's arrest history,

-4-

his release, or his real name, and he alleges that had he known these facts, he would have moved to California to live with his brother.

Matican never contacted Delvalle again after the sting operation. He acknowledges that he discussed his participation in the sting with his parents and a close friend, and that at least one other person knew about his role. On December 8, 2001, Delvalle approached Matican on a street in Queens. Delvalle said, "You ratted me. Why did you rat me?" He slashed Matican's face twice with a box cutter, then fled. Delvalle was arrested several days later; he eventually pled guilty to one count of attempted assault and one count of attempted criminal possession of a controlled substance, and was sentenced to eight years in prison.

Matican filed his suit in the Eastern District in November 2002, stating causes of action under 42 U.S.C. § 1983 and New York common law. Defendants moved for summary judgment on all claims. The district court granted summary judgment on the § 1983 claims and declined to exercise supplemental jurisdiction over the state claims. Matican v. City of New York, 424 F. Supp. 2d 497 (E.D.N.Y. 2006). This appeal followed.

## II. DISCUSSION

We review de novo the district court's grant of summary judgment, construing the evidence in the light most favorable to Matican, the nonmoving party, and drawing all inferences and resolving all ambiguities in his favor. Doro v. Sheet Metal Workers' Int'l Ass'n, 498 F.3d 152, 155 (2d Cir. 2007). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Matican asserted the following causes of action: (1) a claim under 42 U.S.C. § 1983 that the officers violated his right to substantive due process under the Fourteenth Amendment by failing to protect him from Delvalle's assault; (2) a § 1983 claim against the City for failing to train its officers to protect confidential informants from harm; and (3) claims sounding in state law against all defendants asserting that the officers behaved negligently, and that the City is vicariously liable for their actions under the doctrine of respondeat superior.

The first two claims depend on a single threshold question: did the officers' actions violate Matican's constitutional rights? If they did not, then the City cannot be liable to Matican under § 1983, regardless of whether the

-6-

officers acted pursuant to a municipal policy or custom. City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (per curiam). Furthermore, if Matican has no valid claim under § 1983 against any defendant, it is within the district court's discretion to decline to exercise supplemental jurisdiction over the pendent state-law claims. See Kolari v. New York-Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006) (citing 28 U.S.C. § 1367(c)(3)).[1] We therefore begin with the threshold question of whether the officers' conduct infringed Matican's constitutional rights.

Among the liberties protected by the Due Process Clause of the Fourteenth Amendment is "a right to be free from . . . unjustified intrusions on personal security." Ingraham v. Wright, 430 U.S. 651, 673 (1977). But in DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189 (1989), the Supreme Court observed that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." Id. at 195. As a result, the Court held that the Clause "generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to

---

[1] We must also determine the existence of a constitutional violation before we may consider the officers' defense of qualified immunity. Sira v. Morton, 380 F.3d 57, 68-69 (2d Cir. 2004) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)).

-7-

secure life, liberty, or property interests of which the government itself may not deprive the individual." Id. at 196.

We have recognized two exceptions to this general principle, rooted in the Supreme Court's analysis in DeShaney. First, the state or its agents may owe a constitutional obligation to the victim of private violence if the state had a "special relationship" with the victim. See Ying Jing Gan v. City of New York, 996 F.2d 522, 533 (2d Cir. 1993) (citing DeShaney, 489 U.S. at 198). Second, the state may owe such an obligation if its agents "in some way had assisted in creating or increasing the danger to the victim." Dwares v. City of New York, 985 F.2d 94, 98-99 (2d Cir. 1993) (citing DeShaney, 489 U.S. at 201, 203), overruled on other grounds by Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993).

Even if Matican's claim falls within one of these two exceptions, and the officers' behavior violated a constitutional obligation, Matican faces a further hurdle: he must show that the officers' behavior was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." County of Sacramento v. Lewis, 523 U.S. 833, 848 n.8 (1998). This requirement screens out all but the most significant constitutional violations, "lest the

Constitution be demoted to . . . a font of tort law." Id.; see Paul v. Davis, 424 U.S. 693, 701 (1976).

We consider (1) whether Matican's claims fall within either of the two DeShaney exceptions and (2) whether the officers' behavior can be said to shock the contemporary conscience.

A. Special relationship exception.

The special relationship exception grows from the DeShaney Court's observation that "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." DeShaney, 489 U.S. at 198.[2] The Court gave, as examples, the obligations of states to incarcerated prisoners and involuntarily committed mental patients, and concluded that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." Id. at 199-200.[3] Under these limited

---

[2] We recognized this principle before DeShaney, in Doe v. New York City Department of Social Services, 649 F.2d 134, 141 (2d Cir. 1981).

[3] The Court noted that the situation of a child placed in foster care might be sufficiently analogous to those of prisoners or mental patients to trigger the exception, but it did not decide the question. Id. at 201 n.9.

circumstances, the state may owe the incarcerated person an affirmative duty to protect against harms to his liberties inflicted by third parties. But the duty arises solely from "the State's affirmative act of restraining the individual's freedom to act on his own behalf [] through incarceration, institutionalization, or other similar restraint of personal liberty." Id. at 200.

Our own opinions have also focused on involuntary custody as the linchpin of any special relationship exception. See Lombardi v. Whitman, 485 F.3d 73, 79 n.3 (2d Cir. 2007) ("Special relationships arise ordinarily if a government actor has assumed an obligation to protect an individual by restricting the individual's freedom in some manner, as by imprisonment."); Suffolk Parents of Handicapped Adults v. Wingate, 101 F.3d 818, 824 (2d Cir. 1996) (holding that plaintiffs' claim did not fall within DeShaney exception because "the plaintiffs here . . . are not involuntarily institutionalized"); see also Doe v. N.Y.C. Dep't of Soc. Servs., 649 F.2d 134, 141 (2d Cir. 1981) (holding that state is liable under Due Process Clause for abuse suffered by child in foster care, and emphasizing custodial nature of foster care placement).

The relationship between defendants and Matican does not resemble those that have been found to lie within the bounds of

the special relationship exception. Matican freely agreed to serve as a confidential informant in exchange for more lenient treatment. He was not in custody at the time of the sting or of Delvalle's assault. The state did not "render[] him unable to care for himself," DeShaney, 489 U.S. at 200; after all, Matican argues that, had defendants warned him of Delvalle's release, he would have moved to California to live with his brother. That he was in custody when he agreed to become a confidential informant is of no moment: he does not allege that he was coerced, and his former incarceration did not exacerbate his injury. See id. at 201 ("That the State once took temporary custody of [petitioner] does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter.").

We therefore join several of our sister circuits in holding that a noncustodial relationship between a confidential informant and police, absent more, is not a special relationship. Accord Velez-Diaz v. Vega-Irizarry, 421 F.3d 71, 80 (1st Cir. 2005); Dykema v. Skoumal, 261 F.3d 701, 706 (7th Cir. 2001); Butera v. District of Columbia, 235 F.3d 637, 648

-11-

(D.C. Cir. 2001); Summar v. Bennett, 157 F.3d 1054, 1059 (6th Cir. 1998).[4]

B. State-created danger exception.

Like the special relationship exception, the state-created danger exception arises from the Court's analysis in DeShaney.[5] After explaining that no special relationship existed between the state and petitioner, the Court further noted that, "[w]hile the State may have been aware of the dangers that [petitioner] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." DeShaney, 489 U.S. at 201. The Court emphasized that government officers had done nothing worse than failing to take action even though suspicious circumstances may have counseled an active role. Id. at 203. These statements led

---

[4] Matican encourages us to adopt the reasoning of G-69 v. Degnan, 745 F. Supp. 254 (D.N.J. 1990), which held that a special relationship exists between the state and a confidential informant whose safety depends on confidentiality. Id. at 265. But G-69 fails to distinguish between the special relationship and state-created danger exceptions, a distinction that may not have been obvious in DeShaney's immediate aftermath. See id. (finding special relationship because plaintiff's service to state "increased by a corresponding proportion the risk to his life"). As such, we do not find the decision to be particularly persuasive, and choose instead to follow the more recent analysis from our sister circuits.

[5] The doctrine had been recognized in some circuits prior to DeShaney. See Kennedy v. City of Ridgefield, 439 F.3d 1055, 1061 n.1 (9th Cir. 2006) (collecting cases).

us to conclude that, by negative implication, the state does infringe a victim's due process rights when its officers assist in creating or increasing the danger that the victim faced at the hands of a third party. Dwares, 985 F.2d at 99.

In applying the state-created danger principle, "we have sought to tread a fine line between conduct that is 'passive'" (and therefore outside the exception) "and that which is 'affirmative'" (and therefore covered by the exception). Pena v. DePrisco, 432 F.3d 98, 109 (2d Cir. 2005). Thus, we have found state-created dangers (or denied summary judgment where state-created danger theories were alleged) where police officers told skinheads that they would not prevent them from beating up protesters in a park, Dwares, 985 F.2d at 99; where police officers gave a handgun to a retired officer who then shot a fleeing robber, Hemphill v. Schott, 141 F.3d 412, 419 (2d Cir. 1998); where a prison guard told inmates that it was "open season" on a prisoner, and the inmates beat up the prisoner, Snider v. Dylag, 188 F.3d 51, 55 (2d Cir. 1999); and where police officials encouraged an off-duty colleague to drink excessively, after which he killed three pedestrians in a car accident, Pena, 432 F.3d at 110-11. By contrast, we held that no state-created danger existed where a police officer failed to intervene to prevent a colleague from shooting

-13-

someone during an altercation. <u>Pitchell v. Callan</u>, 13 F.3d 545, 549 (2d Cir. 1994).[6]

As the district court recognized, Matican's allegation that the officers failed to learn about, or inform him of, Delvalle's violent criminal history or his release on bail fall on the passive side of the line. "Under <u>DeShaney</u>, allegations that the defendant officers merely stood by and did nothing are insufficient to state a constitutional violation." <u>Pena</u>, 432 F.3d at 110 (internal quotation marks omitted); <u>see also</u> <u>Lombardi</u>, 485 F.3d at 79 ("It is not enough to allege that a government actor failed to protect an individual from a known danger of bodily harm or failed to warn the individual of that danger."). This is so notwithstanding Matican's assertion that the officers promised to protect him. <u>See</u> <u>DeShaney</u>, 489 U.S. at 200 ("The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him . . . .").

By contrast, Matican's allegation that the officers planned the sting in a manner that would lead Delvalle to learn about Matican's involvement is sufficiently affirmative to qualify as a state-created danger. <u>See</u> <u>Kennedy v. City of</u>

_____

[6] We declined to decide whether a state-created danger existed where, after the terrorist attacks of September 11, 2001, federal officials informed rescue workers that the air near the World Trade Center site was safe to breathe, causing the workers to forego protective gear. <u>Lombardi</u>, 485 F.3d at 81.

-14-

Ridgefield, 439 F.3d 1055, 1063 (9th Cir. 2006) (finding that, where police officer informed assailant that victim had filed report against him, and assailant then shot victim, officer "affirmatively created an actual, particularized danger" to victim).[7]

C. Shocking the conscience.

Until recently, Supreme Court and Second Circuit precedent gave little objective guidance as to whether a particular state action does or does not shock the contemporary conscience. In Lewis, the Supreme Court noted one set of parameters:

[7] The defendant law enforcement officers in Dwares, Hemphill, Snider, and Pena all had personal relationships with the third-party assailants, and they either actively facilitated the assaults or personally communicated that assaults would go unpunished. Here, by contrast, the officers' conduct might have indirectly alerted Delvalle to Matican's identity, but the officers had no personal relationship with Delvalle other than the arrest itself. We have thus far found state-created dangers only where there is such a relationship. See Pena, 432 F.3d at 109 ("Our distinction between these categories of cases suggests that 'special relationship' liability arises from the relationship between the state and a particular victim, whereas 'state created danger' liability arises from the relationship between the state and the private assailant."); see also Dwares, 985 F.2d at 99 (describing officers' liability in terms of "aid[ing] and abett[ing]"). However, other circuits have found state-created dangers where state officials had no relationship with the individual causing harm, e.g., Wood v. Ostrander, 879 F.2d 583, 590 (9th Cir. 1989), or where the victim was not harmed by an individual at all, e.g., Kneipp ex rel. Cusack v. Tedder, 95 F.3d 1199, 1209 (3d Cir. 1996). Because the officers' affirmative conduct did not shock the conscience (as explained below), we need not decide whether the state-created danger exception is limited to cases where state officials had a direct relationship with the third party who caused injury.

negligently inflicted harm "is categorically beneath the threshold of constitutional due process," 523 U.S. at 849 (citing Daniels v. Williams, 474 U.S. 327, 328 (1986)), whereas the intentional infliction of injury is the conduct "most likely to rise to the conscience-shocking level," id. As for conduct between these poles, the Court held only that harm inflicted recklessly or with deliberate indifference does not shock the conscience in the context of a time-sensitive emergency, such as a high-speed chase. Id. at 853-54. Here, though, the officers had ample opportunity to plan the sting in advance. Matican argues that the district court erred in holding that the officers did not act with deliberate indifference. He proposes a balancing test to help factfinders determine when the conscience is shocked by reckless or deliberately indifferent state action that creates or increases a danger.

We need not consider Matican's proposed test, because this court's decision last year in Lombardi provides sufficient guidance to resolve this issue. In that case, we considered the claims of rescue and cleanup workers at the World Trade Center site following the 9/11 attacks. The workers in that case alleged that the defendants, federal environmental and workplace-safety officials, issued intentionally false press releases stating that the air in Lower Manhattan was safe to

-16-

breathe, and that in reliance on those statements, the workers did not use protective gear. Lombardi, 485 F.3d at 75. We held that, regardless of whether the situation was a time-sensitive emergency, plaintiffs' allegations of deliberate indifference did not shock the conscience. Id. at 85. "Hurried or unhurried, the defendants were subjected to the 'pull of competing obligations.'" Id. at 83 (quoting Lewis, 523 U.S. at 834). We reasoned that those competing obligations counseled against broad constitutional liability for the government officials, whose decisionmaking might be inhibited by the threat of lawsuits. Id. at 84. We concluded that "[w]hen great harm is likely to befall someone no matter what a government official does, the allocation of risk may be a burden on the conscience of the one who must make such decisions, but does not shock the contemporary conscience." Id. at 85.

The same considerations lead us to conclude that Matican's allegations of affirmative conduct by the officers, even if true, do not shock the contemporary conscience. In designing the sting, the officers here had two serious competing obligations: Matican's safety and their own. They could reasonably have concluded that the arrest of a potentially violent drug dealer demanded the use of overwhelming force, even if that show of force might jeopardize the informant's identity in the future. We are loath to dictate to the police

how best to protect themselves and the public, especially when our ruling could be taken to require officers to use riskier methods than their professional judgment demands.

As we explained in Lombardi, the defendants in our prior state-created danger cases were not subject to "the pull of competing obligations." See id. at 83 (discussing Pena and Dwares). Butera v. District of Columbia, 235 F.3d 637 (D.C. Cir. 2001), which Matican cites, is distinguishable for the same reason: the officers in that case sent an informant into an undercover drug buy while monitoring from the safety of their cars, id. at 642, and thus would have incurred no risk had they fitted the informant with wires or agreed in advance on danger signals, id. at 644.

Because the officers were obliged to protect their own safety as well as Matican's, their design of the sting in this case does not shock the conscience.[8] Matican therefore suffered no violation of his rights under the Due Process Clause.

### III. CONCLUSION

We find that no constitutional violation occurred. We see no need to consider whether the officers enjoyed the benefit of qualified immunity, or whether Matican had a claim against the

---

[8] We need not resolve the vexing questions raised by defendants about the proximate cause of Matican's injuries.

City for a practice or custom of failing to protect confidential informants. Furthermore, because Matican has no valid federal claims, the district court did not exceed its allowable discretion in declining to exercise jurisdiction over his state claims. 28 U.S.C. § 1367(c). We have considered all of Matican's other arguments for reversal of summary judgment and find them to be without merit.

Judgment affirmed.